IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WILLIAM S. NICHOLSON,

       Plaintiff,

       v.                            Civil Action No. 1:08-CV-17

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.    Background

      Plaintiff, William S. Nicholson, (Claimant), filed a Complaint on January 7, 2008 seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on April 8, 2008.[2]  Claimant filed his Motion for Summary Judgment on June 3, 2008.[3]  Commissioner filed his Motion for Summary Judgment on June 11, 2008.[4]

B.    The Pleadings

    1.    Plaintiff's Brief in Support of Motion for Summary Judgment.

    2.    Defendant's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 10.

[3] Docket No. 15.

[4] Docket No. 18.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because: 1) substantial evidence supported the ALJ's determination that Claimant's scoliosis was a severe, but non-disabling impairment; 2) substantial evidence supports the ALJ's weighing of the assessments by Dr. Dawlah; and 3) substantial evidence supports the ALJ's determination that Claimant's impairments would not result in more than one absence per month.  The Court recommends the case be **REMANDED** for further proceedings solely on the issues of whether Claimant's "lazy eye" constitutes a severe impairment that meets or equals one listed by the Secretary and if not, does Claimant's "lazy eye" effect the ALJ's finding that there are a significant number of jobs within the national economy that Claiamnt is capable of performing?

2.    Commissioner's Motion for Summary Judgment be **GRANTED** except on the two issues recommended to be remanded.

## II.  Facts

A.    Procedural History

Claimant was initially awarded Supplemental Security Income ("SSI") as a child on August 22, 1984.  (Tr. 28).  Claimant continued to receive these benefits until February 2, 1999, when he was issued a disability cessation notice.  Claimant appealed this notice and after a subsequent unfavorable reconsideration determination, a hearing determination favorable to claimant was made on March 24, 2000 and his benefits were continued.  (Tr. 223).

Claimant attained the age of 18 on February 3, 2002.  On May 10, 2002, claimant was notified that his SSI was being reviewed under adult standards (Tr. 234)(20 C.F.R. § 416.987).

On June 25, 2002, claimant submitted an application for Childhood Disability Benefits. (Tr. 236). Upon redetermination, claimant's disability was found to have ended on August 1, 2002 and his SSI ceased on September 30, 2002. (Tr. 243). A finding of "not disabled" was also made in August 2002 with regard to claimant's June 2002 application for Childhood Disability Benefits. (Tr. 238). Claimant requested a hearing on these claims on April 17, 2003. (Tr. 278). A hearing was held on September 10, 2003. (Tr. 1084). The ALJ issued an unfavorable decision on October 31, 2003. (Tr. 418). On November 4, 2003, claimant filed a request for review of that determination. (Tr. 435). The request for review was denied by the Appeals Council on December 24, 2003. (Tr. 430).

On January 26, 2004, claimant made a new protective filing for SSI and on January 31, 2004 he submitted another application for Childhood Disability Benefits. Claimant attributed an alleged disability beginning at birth to: curvature of spine; missing one-half vertebrae; heart disease/Tetralogy of Fallot and attention deficit hyperactivity disorder ("ADHD"). (Tr. 465). These claims were denied initially on April 27, 2004 (Tr. 437) and upon reconsideration on August 17, 2004. (Tr. 444). On August 30, 2004, claimant requested a hearing before an ALJ. (Tr. 447). A hearing was held on September 9, 2005 in Bridgeport, WV before ALJ McDougall. (Tr. 1110).

The ALJ denied the claim by written decision on September 26, 2005 finding that claimant was not disabled because he had no medically determinable impairments which met or equaled a listing in Appendix 1, Subpart P, Regulation No. 4 (20 C.F.R. §§ 404.1520(d) and 416.920(d)) and because he could perform a range of unskilled work. (Tr. 25-44). Claimant's Request for Review was timely filed on October 25, 2005 (Tr. 23). On November 16, 2007, the

Appeals Council denied claimant's request for review. (Tr. 13). Therefore, on November 16, 2007, the ALJ's decision became the final decision of the Commissioner. Having exhausted his administrative remedies, claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was nineteen years old on November 1, 2003.[5] His date of birth is February 3, 1984. (Tr. 28). Claimant was therefore a "younger individual 18-44" within the meaning of the regulations from November 1, 2003 (the "period at issue"). (20 C.F.R. § 416.968). Claimant has an eleventh grade education and has no vocationally relevant past work experience. (Tr. 29). Claimant did, however, report that he tried to work as a stock person at a retail store, but purportedly quit after four days due to weakness and shortness of breath. (Tr. 846).

C.    Medical History

The following medical history is relevant to the issues of whether the ALJ erred in finding that claimant's back condition was not disabling and had not become worse since his prior decision; whether he erred by not finding claimant's "lazy eye" to be a severe impairment; whether substantial evidence supports the weight given by the ALJ to the assessments of claimant's treating physician, Dr. Dawlah; and whether substantial evidence supports the ALJ's RFC finding that claimant could work a job that "accommodates unscheduled absences of up to one workday per month":

---

[5] The ALJ found no new or material evidence or other basis that is sufficient to establish "good cause" for reopening and revising the prior hearing determination of October 31, 2003. (20 C.F.R. §§ 404.987 *et seq.* and 416.987 *et seq.*). Therefore, the ALJ restricted the scope of consideration to a determination of claimant's disability status only since the day after the date of that unfavorable decision.

**Lisa P. Stafford, M.S., C.S.P., Psychological Evaluation 2/11/01 (Tr. 286-292)**

WAIS-III:

| | |
|---|---|
| Verbal IQ | 81 |
| Performance IQ | 85 |
| Full Scale IQ | 81 |

Verbal:

| | |
|---|---|
| Vocabulary | 7 |
| Similarities | 7 |
| Arithmetic | 6 |
| Digit Span | 8 |
| Information | 6 |
| Comprehension | 7 |

Performance:

| | |
|---|---|
| Picture Completion | 11 |
| Digit-Symbol Coding | 6 |
| Block Design | 7 |
| Matrix Reasoning | 9 |
| Picture Arrangement | 6 |

WIAT:

| | |
|---|---|
| Basic Reading | 68 |
| Mathematics Reasoning | 67 |
| Spelling | 55 |
| Reading Comprehension | 71 |
| Numerical Operations | 66 |
| Written Expression | 56 |
| Reading Composite | 61 |
| Math Composite | 63 |
| Writing Composite | 49 |

Summary and Recommendations:

Claimant is a student of generally Borderline cognitive ability. He achieved a Low Average IQ score on the WAIS-III. Achievement date is all in the Impaired range. Statistically, Claimant is at the lowest end of the scale in age. Claimant not clear on his future plans, but indicated he wants to learn about construction. Validity of scores are questionable due to prior testing.

**Morgan D. Morgan, M.A., WV DDS 7/22/02 (Tr. 333-37)**

General Observations:

Claimant is appropriately groomed and attired. No abnormalities were noted with posture or gait.

Presenting Symptoms:

Claimant reportedly suffers some variable chest pain due to a heart condition. Reported history of anger control. Reported having an upset stomach. Occasional irritability. Sleep is variable and he has a fair appetite. Energy level reportedly diminished due to his heart condition. Some infrequent crying episodes. Denied any history of suicidal ideation.

Mental Status Examination:
Arrived for his appointment appropriately attired, demonstrating good hygiene and grooming.

Subjective Symptoms:
History of a heart condition which occasionally causes him some chest pain. History of anger control problems at home and at school. History of some episodes of dysphoria. Reported only infrequent episodes of crying and no history of suicidal ideation. Sleep is fair, but occasionally disturbed by some worries over family issues. Reported a fair appetite, but diminished energy level.

Objective Symptoms:
Appeared rather dysphoric, and appeared to be somewhat lethargic. He attributed the lethargy to his heart condition. The client's level of motivation during this assessment appeared somewhat questionable, and he appeared rather uninterested in the evaluation process.

Diagnostic Impression:
Axis I:             (311) Depressive disorder NOS
Axis II:       (V62.89) Borderline intellectual functioning
Axis III:      Reported heart condition, curvature of the spine and seasonal allergies

**Arturo Sabio, M.D., WV DDS 7/27/02 (Tr. 338-42)**
History of Present Illness:
Complains of chest pains on and off. Usually accompanied by shortness of breath. He had cold sweats. Started complaining of back pains for the past two years. He was told that he had slight scoliosis. He denies any increased pain when bending or lifting. No numbness or tingling in any of the extremities. Increased pain with prolonged sitting more than 20 minutes. No operation for the spine.

Physical Examination:
Spine - There is tenderness over the spinous processes of the lumbar spine. There was minimal thoracoscoliosis.

Range of Motion:
Cervical - Lateral flexion is 45 degrees bilaterally; flexion is 60 degrees; extension is 75 degrees and rotation is 80 degrees bilaterally.
Shoulders - Abduction is 180 degrees bilaterally; forward flexion is 180 degrees bilaterally; abduction is 50 degrees bilaterally; internal rotation is 40 degrees bilaterally and external rotation is 90 degrees bilaterally.
Elbows - Flexion is 150 degrees bilaterally, extension is 0 degrees bilaterally; supination is 80

degrees bilaterally and pronation is 80 degrees bilaterally.
Hands - All the hand joints allow 90 degrees of flexion bilaterally and 0 degrees of extension.
Lumbar spine - Flexion is 90 degrees forward and 25 degrees laterally to either side.
Straight leg raising - 90 degrees bilaterally in the sitting and supine positions
Hips - Flexion is 100 degrees bilaterally, extension is 30 degrees bilaterally abduction is 40 degrees bilaterally and abduction is 20 degrees bilaterally.
Knees - Flexion is 150 degrees bilaterally. 0 degrees of extension.
Ankles - Dorsiflexion is 20 degrees bilaterally and plantar extension is 40 degrees bilaterally.

Neurological:
Normal.

Diagnostic Impression:
Tetralogy of Fallot, valvular insufficiency, and chronic back pain secondary to scoliosis

Summary:
The patient had back pain and he was told that he had scoliosis. On this examination, the patient had mild thoracolumbar scoliosis. There is tenderness over the spinous processes of the lumbar spine but the range of motion in the spine and in th upper and lower extremities was entirely normal. Equilibrium and coordination were normal. Fine manipulation movements were normal as well.

**Samuel Goots, Ph.D., Psychiatric Review Technique 8/1/02 (Tr. 347-59)**
Medical Disposition - Impairment(s) not severe

Rating of Functional Limitations:
Functional Limitation:
Restriction in Activities of Daily Living - No degree of limitation
Difficulties in Maintaining Social Functioning - No degree of limitation
Difficulties in Maintaining Concentration, Persistence or Pace - Mild degree of limitation
Episodes of Decompensation, Each of Extended Duration - None

**Cynthia Osbourne, Physical Residual Functional Capacity Assessment 8/2/02 (Tr. 362-68)**
Primary Diagnosis - Congenital heart disease
Secondary Diagnosis - Scoliosis

Exertional Limitations:
Occasionally lift and/or carry 20 pounds
Frequently lift and/or carry 10 pounds
Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations:

Occasionally - climbing, balancing, stooping, kneeling, crouching, crawling

Visual Limitations:
None established

Environmental Limitations:
Avoid concentrated exposure to extreme cold and hazards such as machinery, heights, etc.

Symptoms:
At present he is doing fairly well and RFC is reduced to light with height/hazard restrictions

**Gilmer County Urgent Care, Note 12/12/02 (Tr. 372)**
Hurt back in building construction.  1 week, still not getting better.

**Gilmer Primary Care, Physical 1/31/03 (Tr. 373-75)**
History:
Exertional shortness of breath after walking for 5-10 minutes.  He is known to have scoliosis and intermittent back pain.

Physical Findings:
Wears glasses
Vision - Abnormal
Dyspnea with exertion - Abnormal
Heart sounds - Abnormal

Diagnoses:
1.      Machinery murmur from Tetralogy of Fallot repair
2.      Exertional shortness of breath
3.      Scoliosis

Medical Source Statement:
Because of his exertional shortness of breath I think he will not be able to perform any job that requires physical activity.  Vocational rehab for possible sedentary job may help but without patient motivation it may not be successful.

**Hugh M. Brown, Physical Residual Functional Capacity Assessment 2/20/03 (Tr. 376-83)**
Primary Diagnosis - S/P surgical correction of Tetralogy of Fallot
Secondary Diagnosis - Acute cervical strain

Limitations - degenerative heart disease, chest pain
Exertional Limitations:
Occasionally lift and/or carry 20 pounds
Frequently lift and/or carry 10 pounds
Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday

Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations:
None established

Visual Limitations:
None established

Environmental Limitations:
None established

Are there treating/examining source conclusions about the claimant's limitations or restrictions which are significantly different from your findings?  YES
     -Agree that claimant unable to perform heavy work, however, in view of cardiac stature - no signs of decompensation, regular rhythm...should tolerate light work activity.  Chest pain is now cardiac.

**Minnie Hamilton Health Care Center, Inc., Visit Note 10/4/02 (Tr. 386)**
Complaint of back pain X 3 days
Assessment - muscle spasm left mid back

**A.R. Fogle, PA-C, Gilmer Primary Care, 8/2/01 (Tr. 395)**
Complaint - back hurting again
Assessment - low back pain w/history of Tetralogy of Fallot and history of Tetralogy of Fallot with residual murmurs

**Zubaer M. Dawlah, M.D., Gilmer Primart Care, 8/1997-5/1/01 (Tr. 396, 400, 883-902)**
Dr. Dawlah saw Claimant numerous times during this period for back pain.  He repeatedly diagnosed Claimant with scoliosis

**Lucky Eye Care, 11/10/88-5/14/03 (Tr. 716-25)**
Claimant diagnosed with Amblyopia, Anisometropia and Hyperopia of the left eye.

**Maternal & Child Health, 6/18/84-10/2/03 (Tr. 731-849**)
Medical records from non-relevant period show continued diagnoses of Tetralogy of Fallot and Slight scoliosis

**Donna Morgan, DDS Examiner, Mental Status Evaluation 3/29/04 (Tr. 845-48)**
General Observations:
Hygiene was poor and grooming was disheveled.  His manner was open and cooperative.

Chief Complaints:
Claimant's mother reports that he was born with Tetralogy of Fallot.  He has never worked

outside the home.

Present Symptoms:
Neither claimant nor his mother report problems with mood or other mental health problems. He reports a history of learning problems but denies an history of special education services.

Medical History:
He was recently diagnosed with scoliosis. He takes no medications.

Mental Status Examination:
Gait and posture unremarkable. Manner pleasant, speech normal. Insight was fair. Psychomotor behavior unremarkable.

Prognosis - Guarded

Diagnosis:
Axis I:              v71.09 No diagnosis
Axis II:             v62.89 Borderline intellectual functioning, by history
Axis III:            Reported Tetralogy of Fallot; reported congenital malformations of the bowels and anus; reported scoliosis

**Arturo Sabio, M.D., WV DDS 4/10/04 (Tr. 849-53)**
History of Present Illness:
Claimant born with Tetralogy of Fallot. Complains of becoming short of breath on exertion and he cannot keep up with his peers. Is able to walk at a normal pace with no problem but he cannot run. He was diagnosed with attention deficit/hyperactivity disorder and was told that he had a learning disability. He complains of on and off pain in the lumbar spine and also on the neck. He saw a physician and was told that this was due to abnormal curvature in the spine. He was told that he had scoliosis.

Physical Examination:
Spine - There is mild scoliosis at the thoracic level
Neurological - Normal

Range of Motion:
The range of motion examination was normal. Fine manipulation movements were normal.

Diagnostic Impression:
Tetralogy of Fallot, status post repair of Tetralogy of Fallot, cardiomegaly, learning disability, attention deficit/hyperactivity disorder

**Dean R. Ball, D.O., Mahoning Valley Imaging, Radiologic Consultation 4/8/04 (Tr. 854)**
Thoracic Spine:

Frontal and lateral views of the thoracic spine were obtained and reveals mild degenerative changes throughout. I see no fracture or destructive process. There is marked rotoscoliosis of the thoracic spine convexity to the left. Intervertebral disc height is well maintained.

**Michael E. Carter, Ph.D., Psychiatric Review Technique and Mental RFC 4/22/04 (Tr. 916-32)**

Functional Limitation:
Restriction of Activities of Daily Living - Mild degree of limitation
Difficulties in Maintaining Social Functioning - Mild degree of limitation
Difficulties in Maintaining Concentration, Persistence or Pace - Mild degree of limitation
Episodes of Decompensation, Each of Extended Duration - No degree of limitation

Mental RFC Assessment:
The ability to understand and remember detailed instructions - moderately limited
The ability to carry out detailed instructions - moderately limited

The Claimant alleges disability due to congenital heart condition and is a slow learner. Claimant's ability to understand and remember complex or detailed instructions is limited, however, he would be expected to understand and remember simple one and two step instructions. He can make simple decisions. Furthermore, he is able to carry out short and simple instructions. He could be expected to complete a normal workweek without exacerbation of psychological symptoms. He is capable of asking simple questions and accepting instruction. He is able to maintain socially appropriate behavior. Additionally, he retains the ability to perform repetitive work activities without constant supervision.

The Claimant is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment.

**Thomas A. Lauderman, DO, Physical RFC Assessment 4/23/04 (Tr. 933-40)**

Exertional Limitations:
Occasionally lift and/or carry 20 pounds
Frequently lift and/or carry 10 pounds
Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations:
Occasionally climb, balance, stoop, kneel, crouch, crawl

Visual Limitations:
None established

Environmental Limitations:
None established

**Chameleon Health Care, Cynthia L. Hagan, MA & Michael D. Morrello, M.S.,**
**Psychological Evaluation 7/14/05 (Tr. 950-77)**

<u>Presenting Problems:</u>
Claimant feels he is unable to work due to decreased psychological functioning and increased physical pain.  Due to his heart condition, he experiences fatigue, shortness of breath and dizziness.  Exposure to heat or overexertion exacerbates these problems.  He also has a slight case of scoliosis, and incomplete discs in his shoulder blades.

<u>Medical Health:</u>
Claimant described his overall health as "not good."  Today, he judged his pain as a three on a scale of one to ten (with ten being the most extreme pain imaginable).  On an average day, he described his pain as 5.  Claimant reports that he is able to lift approximately 15 pounds safely and without causing an increase in pain.

<u>Test Results:</u>
WAIS-III:

| | |
|---|---|
| Verbal IQ | 84 |
| Performance IQ | 85 |
| Full Scale IQ | 84 |

Verbal:

| | |
|---|---|
| Information | 5 |
| Similarities | 11 |
| Arithmetic | 6 |
| Vocabulary | 6 |
| Comprehension | 8 |
| Digit Span | 8 |

Performance:

| | |
|---|---|
| Picture Completion | 11 |
| Coding | 6 |
| Picture Arrangement | 6 |
| Block Design | 7 |
| Matrix Reasoning | 9 |

Overall cognitive functioning measured within the Low Average range.

WRAT-III:

| | |
|---|---|
| Reading | 41 |
| Spelling | 27 |
| Arithmetic | 30 |

<u>Diagnostic Impression:</u>

Axis I:          296.33 Major Depressive Disorder, Moderate
                 300.00 Anxiety Disorder NOS
Axis II:         V71.09 No diagnosis
Axis III:        Complications due to a heart condition, low back pain
Axis IV:         Economic Problem:   Low Income
                 Vocational Problem:  Unemployed
Axis V:          56

Mental RFC Assessment:
Limitations in understanding remembering and carrying out instructions:
Understand and remember short, simple instructions - mild
Carry out short, simple instructions - mild
Understand and remember detailed instructions - moderate
Carry out detailed instructions - moderate
Exercise judgment or make simple work-related decisions - moderate

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines:
Sustaining attention and concentration for extended periods - moderate
Maintaining regular attendance and punctuality - moderate
Completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks - moderate

Limitations in social functioning in a normal competitive work environment:
Interacting appropriately with the public - mild
Responding appropriately to direction and criticism from supervisors - moderate
Working in co-ordination with others without being unduly distracted by them - moderate
Maintaining acceptable standards of grooming and hygiene - none
Maintaining acceptable standards of courtesy and behavior - mild
Relating predictably in social situations in the workplace without exhibiting behavioral extremes - moderate
Demonstrating reliability - moderate
Ability to ask simple questions or request assistance from coworkers or supervisors - mild

Adaptation in a work setting:
Ability to responds to changes in the work setting or work processes - moderate
Ability to be aware of normal hazards and take appropriate precautions - moderate

Functioning independently in a competitive work setting:
Carrying out ordinary work routine without special supervision - moderate
Setting realistic goals and making plans independently of others - moderate
Traveling independently in unfamiliar places - extreme

Limitations in work adjustment:
Ability to tolerate ordinary work stress - moderate

Psychiatric Review Technique:
Functional Limitation:
Restriction of Activities of Daily Living - Mild degree of limitation
Difficulties in Maintaining Social Functioning - Moderate degree of limitation
Difficulties in Maintaining Concentration, Persistence, or Pace - Moderate degree of limitation
Repeated Episodes of Decompensation, each of extended duration - One or Two

**WV Dept. of Health and Human Resources Disability Determination, Dr. Dawlah, 5/10/05 (Tr. 980-81)**
Applicant's Statement of Incapacity/Disability - Difficulty with comprehension
Mild scoliosis in thoracic spine. Occasional back pain.

**Dr. Dawlah, RFC Assessment, 9/8/05 (Tr. 1013-20)**
Relevant medical history - low back pain, history of heart murmur from congenital heart disease, history of learning disability, depressive illness.

Impairments and symptoms alleged by claimant:
1. Heart murmur
2. Congenital heart disease
3. Tetralogy of Fallot with surgical repair and residual murmurs
4. LS spine strain
5. Mild thoracic scoliosis
6. Major depressive disorder, moderate, borderline intellectual functioning, anxiety disorder

Recommended sedentary (sitting most of the time, walking and standing occasionally, lifting no more than 10 pounds) activity for an 8 hour day.
Patient must alternate positions frequently.
Patient requires a sit/stand option.
Patient can sit for one hour at a time, stand for one hour at a time and walk for one hour at a time.
If alternately walking and standing, he would be able to be on his feet for 2 hours.
Patient would be able to sit upright for 1 hour per day.
Patient would not be restricted from any of the following activities:
Climbing
Balancing
Stoop/bend
Kneeling
Crouching
Crawling
Stretching
Reaching

Squatting

*Patient can perform these activities a few times each during an 8 hour day

Patient should only avoid all exposure to machinery, jarring or vibrations and should avoid moderate exposure to:

excessive humidity

cold or hot temperatures

fumes, dust

noise

environmental hazards

Patient is expected to experience chronic mild to moderate pain and intermittent severe pain.

Patient would be expected to miss three or more days of work per month.

Patient is incapable of performing any full-time job.

**Minnie Hamilton Health Care Center, Final Report 10/5/06 (Tr. 1074)**

Findings:

Lumbar spine as seen on this examination is unremarkable. Severe deformity of the upper thoracic spine is noted. Hemivertebra is noted. Severe dextroscoliosis is noted with apex of the curvature at T3-4. Scoliosis measured at 32.6 degrees.

D.      Testimonial Evidence

Testimony was taken at hearings held on September 10, 2003 and September 9, 2005.

The following portions of the testimony are relevant to the disposition of the case:

HEARING HELD ON 9/10/03

BY ADMINISTRATIVE LAW JUDGE:

Q      Okay. Can you read and write English okay?

A      I can read some, but I really don't understand all of what I'm reading.

Q      Uh-huh.

A      So - -

Q      Can you read like your local paper?

A      I can read it, but I don't understand it.

Q      How about writing? Can you write okay?

A      Usually, when I - - with my writing, everybody has - - everybody else has a hard

time reading it because unless I take my time at it, it all looks like chicken scratch.

WTN　　　　He's not very good at spelling his words.  He's not a good speller.

*　　　　　　*　　　　　　*

Q　　　What's the main problem affecting you that would cause you to have difficulty doing any kind of work?

A　　　My heart condition, it's - -

Q　　　What is your heart condition?

A　　　Well, when I was - - I don't know where to start at on that.

Q　　　Well, how does it affect you now?  What hurts?

A　　　It's - - with the way it is - - the way it affects me now is the heat, because if I'm in the heat for a long time or something, it - - I guess it overexerts - - I get overexerted because of being in the heat.  And I'm not used to being in the heat or anything like that because when I - - as I was growing up, I always tried to stay away from the heat as much as possible, because it would be - - the heat would make it to where it was hard for me to breathe.

Q　　　What's the name of your heart condition?  Do you know?

A　　　I believe the name of it's tetrologyaphello [phonetic].

Q　　　Yeah.  Tetrologyaphello, yeah.  And it's - - so most of the problems you have is with the heat.

A　　　 The heat.  Most of the time it's the heat.  And during the winter also.

Q　　　What problems do you have during the winter?

A　　　Staying warm.  And I have a real bad problem during the winter staying warm. So it just - - in a way in the winter it almost does the same thing to me.  It's just that I can't stay

warm, and I always have to have blankets and stuff around me all the time during the winter. And that's mostly what it does during the winter, it's just - - it makes it to where I have to stay underneath blankets to stay warm.

Q        Are you getting any on going treatment for this?

A        I go to Charleston every three to six months, but I don't take any medication or anything for that.

Q        No medicine.  Now when you say you to go Charleston every three to six months, is that just to see the doctor, or do they do anything?

A        That's to see my cardiologist.  I have a EKG and sometimes they do a - - like an ultrasound for my heart, to see how it's doing.

Q        When was the last time you had one of these?

A        I'm not sure.  Was it last month or this month?  No.  It wasn't this month.  I think - -

*               *               *

Q        Is that - - okay.  Do you have any problems with walking?

A        It all depends on how far I'm walking.  And I can walk - - if I'm not walking that far, I can usually do it.  But if it's like I have to walk a mile or something like that, it makes it to where I have to stop every five to ten minutes to rest and catch my breath.

Q        So you can walk about ten minutes before - - without having to stop.

A        Yeah.

Q        Do you have any problems with standing, like if you're at home in the kitchen

around the sink, or stove, or something, is there any problem with just standing?

A      No.

Q      Do you have any problems with sitting, if you're watching TV or working on a
computer or something, any problems with sitting?

A      No.  Other than when - - usually when I'm sitting, I don't have very many - - very
much problems with it.  And usually, I can keep my breathing and stuff under control while I'm
sitting.

Q      What kind of problem - - when you say keep your breathing under control, what
do you mean?

A      Like - - it's like when I'm standing or something.  It's like I start breathing a little
bit harder, like it's kind of like a lack of oxygen.

Q      If you're standing?

A      Well, it's I don't know exactly how to explain it.

Q      You mean like your heart doesn't pump oxygen as well?

A      Yeah.  It's like that.

ALJ         Yeah.

                          *              *              *

BY ADMINISTRATIVE LAW JUDGE:

Q      Okay.   Now do you have any problems with your hands or fingers?

A      No.  Not really.  I - -

Q      Go ahead.

A      I don't have any problems with my hands and fingers, but I just can't keep - -

seem to keep them still.

Q       How much can you lift?  And when I say lift, I don't mean like bend over to the floor and pick up with, you know, all the way from the floor.  If you're sitting or standing at a table, like we're at, how long - - how much could you pick up, and say move to a refrigerator, move to another table or something?

A       I probably - - I'm not sure about that, probably about ten - - five or ten pounds, at the most.

Q       Why is that?  Why only five to ten pounds?

A       I've never really measured that.  That's just about how much I'm - - because usually, if it's over ten pounds, I kind of have struggles with it because of my heart.  Like almost anything over ten pounds or something like that, usually it puts a strain on me to where I have to kind of struggle with it.

                        *                *                *

BY ADMINISTRATIVE LAW JUDGE:

Q       Okay.  Now we have Dr. Ly, but we show an evaluation in July of last year that said your heart - - your cardiac status was compensated at this time, and you just need follow-up every six months.  Now do you have any problem - - do you have a slight scoliosis?

A       Yes, sir.

Q       Are you getting any treatment for that?

A       I was supposed to - - they had scheduled me for an appointment on the 4th of this month, and then they had to - - then they cancelled it because there was no clinic for the 4th of the month, there was no clinic that they could send me to.

*           *           *

BY ADMINISTRATIVE LAW JUDGE:

Q      Do you have any problems that are caused by the scoliosis?

A      Yes.  Usually I can - - if I'm sitting down for like too long, and I go to stand up,

usually my back hurts me.  And - -

Q      How long do you have to be sitting before that happens?

A      It varies on like what kind of material - - or what kind of chair, or couch, or

something like that that I'm sitting on.

Q      You're not taking any medicine or anything for this - - your back.

A      No, sir.

Q      Now are you getting any treatment for any other conditions?  Are you getting

treatment for depression, or nerves, or anything like that?

A      No, sir.

Q      Do you have any problems with depression or nerves, or anything?

A      No, sir.

Q      How do you spend your time most days?

A      Most of the time that I have to spend, I usually spend my time playing games on a

Playstation - -

Q      Playstation.

A      - - or on a Nintendo, or something like that, on the TV.  But I don't - - I can't sit

and do that for too long, because I'm hyperactive.  I'm all the time moving around.  But I don't

move around all that much.  And usually, if I'm not doing that, I usually listen to - - go to my

room and listen to music.

WTN          He has two games and a computer hooked up, Playstation, Nintendo, computer, and his CDs.

CLMT          And most of the time it's my CDs I listen to.

BY ADMINISTRATIVE LAW JUDGE:

Q          Do you ever get out of the house and do anything outside of the house?

A          Sometimes I'll get out and walk around outside a little bit.  And then I'm right back inside.

Q          Do you ever get out and go to a movie, or church, restaurants, or anything like that?

A          No, sir.

Q          Do you have any friends?

A          Yeah.  I have friends, but most of the time I don't talk - - I hardly talk to them most of the time because of - - usually, they're not around all the time for me to talk to.

Q          Are these kids from high school?

A          Yes.

Q          Are they still in school or are they - -

A          Still - - some of them are still in school, and some of them aren't.

Q          Do people ever come over and visit you?

A          No, sir.

Q          Do you help out around the house with any cooking or cleaning, or dishes, trash, or anything like that?

A        Most of the time I try to, but she - - most of the times she has to make me sit down, or help me sit - - she either has to make me sit down or help me sit down, because I get overexerted trying to do that.

WTN            He was 16 [inaudible], and a lot of times he'll try helping me mop the floor, because I'm disabled myself.  And he'll get it out before I will.

ALJ            Do you ever get out and go grocery shopping?

CLMT        No.

WTN            I want him to help me grocery shop.

BY ADMINISTRATIVE LAW JUDGE:

Q        Ever get out and go to like a shopping mall or anything like that?

A        No, sir.

Q        Do you do any lawn work or anything?

A        No, sir.

Q        Any problems getting dressed, or bathing, or eating?

                              *                    *                    *

BY ADMINISTRATIVE LAW JUDGE:

Q        Have you ever worked anywhere?

A        No, sir.

Q        Okay.  Have you ever looked for a job or anything?

A        No.

WTN            Well, he did have a job once?

ALJ            When?

| | |
|---|---|
| WTN | At Family Dollar.  Remember? |
| CLMT | Oh, yeah. |
| WTN | They - - |
| CLMT | I forgot about that. |
| WTN | - - had him in the summer youth program, he - - they had him scheduled |

for a couple of weeks, and he went down.  He was helping them move some boxes and sweep.

And he messed up his back.  He had to go to the doctor, and they gave him Tylenol #3, with

codeine.  His back had swelled up and knotted up on him after a couple of days.

*          *          *

| | |
|---|---|
| CLMT | Do you have anything to add, Mom? |
| WTN | If he went out to work somewhere, he'd have to have direction or |

someone to take him there, because he can't follow directions.  And he'd have to have someone

to really sit down with him and teach him how to basically read better than he does, and take him

through the spelling.  I tried myself to get him to where he could read.  I bought him comic

books and everything.  But his spelling is just out there somewhere.  I got him a computer to

help him with spelling, got him to write short stories, but I have to go back and correct every

other word he writes down.

| | |
|---|---|
| ALJ | Yeah. |
| WTN | The school has just completely failed us. |

*          *          *

Q      It doesn't look like he's mildly retarded.  His IQ is above that significantly.  But

he does have problems with reading and writing, which seem to indicate a learning disability.

23

Let me ask some questions of the - - oh, there's a notation in the record that you spend a good deal of time visiting an uncle nearby.

A       That was his Uncle Donnie, before he died.

*               *               *

ALJ       There's also a notation that you do some hunting.

CLMT       My dad had tried to - - my dad had taken me hunting a couple of times, but that was just like - - most of the time he - - if he did take me, he didn't - - we didn't even go maybe 100 yards away from the house.  He just - - and then we'd maybe stay out there for maybe 20-25 minutes and then come back.  He didn't want to keep me out there - - outdoors too long.

ALJ       Okay.

WTN       He did shoot his first squirrel last year.

ALJ       Did you keep it and eat it?

CLMT       Yes.

ALJ       Now were you hunting for squirrel, or deer, or rabbits, or whatever?

CLMT       Squirrels.  It was during squirrel season, that my dad had tooken [sic] me - - taken me out there.  And until I got - - until I reached the age of, what, 16-17, I never really did go hunting.  So until I reached the age of about 16 or 17, I never went hunting at all until after my dad had took - - taken me last - -

ALJ       Just the last couple years.

CLMT       Yeah.

ALJ       And did you use a rifle or shotgun?

CLMT        A little .22, a .22 rifle.

*          *          *

ALJ          Okay.  Now I don't see any work activity, so [inaudible] a hypothetical question.  If we assume a person of the same age, education, and work experience as the Claimant, but assume the person is able to do light work, as that's defined in the Commissioner's regulations, but assume that the person should have no exposure to extreme heat or cold as part of the job.  And the person should be able to use the restroom on an unscheduled basis, up to three times a day, in addition to normal breaks just for one to two minutes at a time.  The person should be - - there should be no reading, writing, or arithmetic, at more than second grade level.  Would there be any jobs such a person could do?  Light work involves lifting no more than 20 pounds at a time, and lifting up to ten pounds two-thirds of the day.  It does involve being on your feet for most of the workday.  So when I say light work, that's what I mean.  Go ahead, Mr. Czuczman.  Would there be any light or sedentary jobs?  And sedentary means lift - - as I said earlier, lifting no more than ten pounds for a third of the day, and sitting almost all day.  Let's go off the record while he looks through his [inaudible].

*          *          *

A        Okay.  The following would fit within the hypothetical.    In the light exertional - - and these jobs are at a level one, so therefore, they meet the requirement of no more than second grade reading, writing, or math - - stock checker for apparel.  You have 65,000 national, you have 200 regional.  Office cleaner - -

Q        Just a minute.  65,000 and 200?

A        200, yes, sir.

Q        Yeah.  Office cleaner.

A        Office cleaner, you have 1.5 million for the national, regional 3,000.  Folder, 75,000 for the national, and for the region, you have 1,000.  Cleaner/polisher - -

Q        Is this sedentary or light?

A        Light still.

Q        Okay.

A        It's 95,000 nationally, 800 for the region.   Now at the sedentary exertional, work as a laminator I, you have 75,000 for the national, for the regional, you have 400.  Plastic design applier, we have 60,000 national, 300 regional.  Patcher - -

Q        Just a - - how man of the plastic design applier?

A        300 for the regional, sir - -

Q        And how many - -

A        - - 60,000 national.

Q        - - 60,000?

A        Yes, sir.  Patcher, 65,000 national, and regional, over 200.  Getterer, 60,000 - -

HEARING HELD ON 9/9/05

Q        Now you indicated you haven't been able to work, basically your whole life, what's been the problem with your ability to work over the last four or five years or so?

A        Well, I have, I have problems with my back, I get shortness of breath because of my, the way of my chest.  I really can't comprehend with directions all that well.  I really can't sit, I really can't sit still long enough to really do anything.  I have a problem - -

Q        Why not?

26

A       Well, as far as I know of, when I was younger I was diagnosed with A, I think it's

called ADHAD.  That's like a hyper, hyperactive attention deficit disorder.

Q       Yeah.

A       And - -

Q       Do you take any medication?

A       I'm not able to because of my heart.

Q       Did you take any medication in the past?

A       For the attention problem?

Q       Yeah.

A       No sir.

Q       You never took Ritalin or Adderall or anything like that?

A       No, sir, that affects the heart and they wouldn't allow me to take it.

Q       Did you ever take any medicine for your heart?

A       No, sir.

Q       Have you ever taken any medicine for your back pain?

A       Yes, sir.

Q       What was that?

A       That was like, it's a muscle relaxer and - -

Q       Flexeril or - -

A       Yes.

Q       Have you had any other treatment for your back?

A       No sir, just medication.

Q     And did that work?

A     No sir, it does, it's like my body system gets used to the medication and it tends to stop working.

Q     What makes your back pain worse?

A     Basically, moving, movement, bending, standing up, sitting, all this really makes my back hurt, and as I'm sitting here today, I can put my hand on the Bible and I can tell you right now my back's hurting just sitting here.

Q     How long can you sit at a stretch before you have to get up and move?

A     No more than an hour at a time.

Q     An hour?

A     Most generally, I get up before an hour's time to even, before I'm even sat down for an hour, most of the time I'm usually up and walking around or moving or something to get my back to where it's not in one position all the time so it's not hurting.

Q     So how long do your normally sit before you get up and move?

A     Normally, maybe, if I'm lucky, 10 or 15 minutes.  I mean, I can force myself to - -

Q     How far - -

A     I can force my - -

Q     How far can you walk at a stretch?

A     Right now, not very far.  I couldn't really tell you exactly how far, but I really wouldn't be able to tell you exactly how far, but I know it wouldn't be too far.

Q     How long can you stand at a stretch before you'd have to sit down?

A     About the same amount of time as I would for sitting.  I've said 10, 15 minutes

tops, top probably be in bout an hour at the most.

Q        Any problems with your hands or fingers?

A        No sir.

Q        What's the most you could lift, you think, say off the table or something?

A        Without anything hurting, five or ten pounds.  But I wouldn't be able to do it all day though.

Q        Anything cause your shortness of breath to get worse?

A        Walking long dis - - - walking a long distance, taking, well, I, like, for instance, if I was like taking up boxes that's like five or ten pounds and I had to move them from, and moving them, that would, well, the best way I can explain it is even with me picking up like stuff that, stuff in my room, like when I go to clean my room, that causes, sometimes that causes my back to hurt and causes me shortness of breath from having to bend over and pick up things so much.  I go weeks at a time without cleaning my room because, because of it.

Q        Do you have any other conditions that affect your ability to work?

A        Besides my back and my chest and not being able to really concentrate on anything, that's about all that I know of, and plus I can't sit, really can't sit still because of being hyper, but yet I have, most of the time I'm made to sit still because of getting short of breath.

Q        Well how do you spend your time most days?

A        Most days I just, I mean, most of the time I'm really, I get up and I walk around the house, I'll sit down and I'm up and down constantly in the house, I don't sit still.  I play video games for enjoyment cause I really don't go outside all that much, and even then, I only spend maybe five minutes at a time even playing a game and then I'll put the game on pause and

I'll be doing something else before I even get a chance to finish what I'm doing on the game, and it may be, and it'd probably be an hour or two before I even go back to playing a game.

Q      Do you help out around the house with any cooking or cleaning or dishes or anything like that?

A      I try to, but most of the time I'm, I try to, but most of the time, like I said, I'm, my family watches over me like a hawk so most of the time, you know, they don't want me getting fatigued or short of breath, but yes, I do, help around the house a little bit, I try to as much as possible.

Q      You ever get out and go grocery shopping?

A      Every once in a while I'll go with my mother to the grocery store to do grocery shopping, but we're usually in there all day because it takes me all day to, it usually takes her a while to get me through the store without getting tired.

Q      Do you have a driver's license?

A      No sir, I don't.

                    *                    *                    *

Q      Do you have any problems getting dressed or bathing or eating?

A      No sir.  I can, I mean, the main thing is, is with, I mean, I don't have no problems getting dressed.   It takes me a while but I have no problems dressing and cleaning and doing the personal needs for myself.

Q      Do you ever get out and go to a restaurant or a movie or a church or anything like that?

A      I don't go to church.  Sometimes I might go to a restaurant, but that's usually

going through the drive through, and I don't go to the movies.

Q        Do you ever get out and visit friends or relations?

A        Whenever, when I get a chance to, whenever they come to the house or something like that, and I, every once in a while - -

Q        People come to visit you?

A        Not really.  I don't have many friends that do come to visit, and most of my family stays a pretty good distance away from us.

Q        Well who comes over to visit you?  You said some, when people come over to visit.

A        Sometimes the couple, couple of boys that, couple of my friends that I know from school was like, maybe like one or two of em come to the house, but they don't stay too long, they usually come there and stay for bout an hour, hour and a half, and then they leave, but I don't get a lot of company at my house.

Q        Would you spend a lot of time watching TV or listening to the radio?

A        I listen to the radio more than I do listen, more than I do watch TV.

Q        Have you looked for work anywhere in the last four, three or four years?

A        No sir.

Q        Do you receive any kind of income from the state or food stamps or anything like that?

A        The only thing I receive is food stamps, but I'm on, I'm on my mother's food stamps.  I don't receive mine.

ALJ        All right, thank you, sir.

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q        Mr. Nicholson, did I, do you have a girlfriend?

A        Yes.

Q        Okay, now does your girlfriend ever come and visit your house?

A        Yes.

Q        Okay, when she comes, how does she get there?

A        Her mother brings her.

Q        Okay.  And when your girlfriend comes to visit, approximately how often does she come?

A        That all depends on when they can afford the gas money to since gas prices just went up.

Q        Okay, well say before the gas prices went up, say in the last year?

A        In the last year?

Q        Uh-huh.

A        They've been there quite often.

Q        Now when they come, do they stay or do you go some place with them?

A        Sometimes, most of the time I go try to, try to go and stay with them for like one or two days - -

Q        Okay.

A        - - at a time.

Q        Okay.

A        No, they really don't, she really don't stay there overnight because of us having

so many in our household.

Q      Okay.  Now let me ask you - -

ALJ      Sorry, I didn't hear that, because of what?

ATTY      So many in his house, so many in his house.

ALJ      So many in your household?

ATTY      Right, I guess maybe they didn't have room - -

BY ATTORNEY:

Q      - - is that what you meant?

A      Yes.

Q      Okay.

A      We don't have the extra room is true.

Q      Extra rooms, okay.  But now you do go over and stay at her house, is that right?

A      Yes.

Q      Okay, now, how long have you, has she been your girlfriend, approximately?

A      I'd say going on a little, going on two years probably.

Q      Okay.  Now does she have a driver's license?

A      No.

Q      And how old is she?

A      She's 20.

Q      Okay.  Does, is she disabled?

A      I'm not sure, ma'am.

Q      Is she on SSI?

A        I think so.  She gets a check through Criss Cross.

Q        Okay.

A        I'm not sure if it's SSI.

ALJ        I'm sorry, I can't understand what you're saying.

ATTY        He said he thought she was and that she had a check through Criss Cross, and I think that's a payee organization, I think that's what's that is.

*                    *                    *

Q        I understand.  All right, well let me ask you how you feel about yourself.  Let me ask you about any other pain than your back, do you have any other kind of pain?

A        Every once in a while I do get, I mean, it's, it happens often, but I couldn't tell you how often it happens, but I get, I get like, kinda like sharp pains that go through my chest or something like that.  It lasts for, I'd say approximately two, three minutes and then it'll stop and - -

Q        When that happens, where is it, where in - -

A        It usually goes, it usually happens right through here.

Q        Okay, now you're kind of rubbing your breast bone?

A        Well it usually happens like right through here.

Q        All right and - -

A        Probably more towards the left side.

Q        Okay.  Now, at one point you were seeing a cardiologist by the name of Dr. Lee, is that right?

A        Yes, ma'am.

Q        And has it been some times since you've seen him?

A        It's been, well it hasn't quite been a year because I just went, I seen him just before I turned 21.

Q        Okay. When you turned 21, was there some problem with continuing to see him?

A        I was no longer, I was no longer eligible for the women's and children's program.

Q        Was that - -

A        And - -

Q        - - for underage people, I mean, like people under 21?

A        It's for, it was women's and children's handicap.

Q        Okay, and so you were seeing him through that program and - -

A        Yes ma'am.

*                    *                    *

Q        Okay, is a chest cold just, is it more serious for you when you get it - -

A        Yeah.

Q        - - or is it just like a chest cold like anybody would get?

A        Well, I think it's kind of more serious when I get it because when I get a chest cold, I'll start coughing and it's like I can't, and it's like I can't stop coughing, and then after, and then when I do get to where I can keep myself from coughing, it's like I can't breathe.

Q        So that makes you short of breath then?

A        Yes.

*                    *                    *

A        Well I can't, I couldn't really exactly tell you because I have [INAUDIBLE],

well, my energy level, I mean, I feel fine, but all at the same time, sometimes I feel fatigued at times, but I also have trouble sleeping at nighttime too so, I believe that's part of my problems, because at nighttime I just, I can't get comfortable, I toss and turn.

Q      What is it that causes you to not get comfortable at night?

A      Well, I can't, I can't sleep on my back and if, I try to sleep on my sides and it, and it kinda like feels like it's putting my back in a bind.

Q      Okay.

A      So - -

Q      All right.

A      - - at nighttime, but I've never really had what you'd say a good sleeping pattern.

Q      Okay.

A      I've always ended up, everybody else in the house can go to bed at like 10:00, or 9 or 10:00 and I'll end up being up for another four or five hours because I can't sleep.

Q      Uh-huh.  When  you finally do get to sleep, how many hours do you think you sleep in a normal night?

A      If I'm lucky, three.   I can tell you today or, I went to sleep, I finally did get a chance to doze off about 5:00 this morning.

*         *         *

Q      Okay.  All right, now you indicated that you didn't go out very much, out in the yard, is that right?  How much of the time do you think you spend indoors?

A      Over 90% of my time is spent inside the house.

Q      Is there any particular reason for that?

A       Really, I mean, I can't, I can't really give you any particular reason because me, myself, I don't know, I'm just, I guess since I can't do what I wanting to do, most of my time is spent inside.  Most of the time I'm either laying down or sitting or walking around the house or trying to play a video game.  Might as well say trying cause I can't even sit still long enough to play one of those.

Q       All right.  Do you have any dislike of going outside?

A       No, I like to be outside but most of the time here lately it's either, it's been, actually too hot to go outside here lately.

Q       Okay, well - -

A       And in the mornings it's too cold to go outside.

Q       Okay, are you saying that temperatures, you're sensitive to temperatures?

A       Well, it it - -

Q       Outdoor temperatures?

A       - - when it gets hot outside, I feel if, feels like I can, it feels like it takes my breath when I'm out in the hot air - -

Q       Uh-huh.

A       - - or out in the hot sun.

Q       Okay, how bout in the morning when it's cool?

A       In the morning I'm wrapped in, I'm wrapped up in blankets in the morning.

Q       Okay, so are you, sounds like you're a little sensitive then to be cool?

A       Yes.

Q       Cold weather?  All right.  Well, I mean, do you ever get outside and do something

like, well, I mean, I don't know, maybe you don't ride bicycles but - -

A     Well I have a bike, every once in a while I'll ride one, but that's - -

Q     Do you have any difficulty riding it?

A     Yeah.  I can ride, I, I mean, I can ride it from my house, from the house down to the garage and back and by the time I get back to the house with the bike, I'm short of breath.

Q     Okay.  When you go and visit your girlfriend, does her mother take you all out places or do you - -

A     Yes, she normally takes us out places, but most  of the time it's spent there at their place.

Q     Right at their house?

A     Yes.

Q     Okay.  When she takes you places, where does she take you?

A     Normally just, I guess you could say just driving around, no in particular place.

Q     Okay, just to drive you around just to get you out a little bit?

A     Yeah.

Q     Okay.  Now, I've noticed you're jiggling and bouncing over there - -

A     I'm sorry about that, I'm - -

Q     Is that, are you nervous here today particularly?

A     No, I just feel like I have to have a part of my, if I'm sitting still, I usually have my foot bouncing or something cause I'm not used to sitting still all the time.

                    *            *            *

Q     Uh-huh, okay.  Well, I don't mean to cut you short, but I wanna ask you

something about attendance when you were at school. When you were in high school and going through the, say the ninth, the tenth and the eleventh grades, did you have any difficulty with attendance?

A    Yes.

Q    What, tell me a little bit about that, what kind of problems did you have?

A    With attendance?

Q    Uh-huh.

A    Basically, most of the time I was either, I either didn't go to school because of my chest and my back and when I did get to school, if my chest or my back or something started hurting me while I was in school, the principal there, from there he would call and have my mother to come and get me. Most of the time I'd, after she would come and get me, we'd go down to the doctor's office and - -

\*                \*                \*

A    Chest, back, basically, that was it, mainly it was from my chest and my back. There were some days that I was down and out with the flu cause in the wintertime it's, in the wintertime when it starts getting cold out, I catch a cold real easily and during this, during the days that it starts warming up or whatever, like during the, well, I can't say fall because that's close to winter, around June or July when it's, or actually when it starts to just warm up some - -

Q    Uh-huh.

A     - - most of time when it starts warming up I catch a cold when, easy when it's warm too so - -

\*                \*                \*

Q       All right, now, is there any, I know I haven't asked you everything, but is there anything in particular that I might not have asked you that you think would be important for the Judge to know about, anything to do with why you think you can't work? I know you did have some trouble with one eye.

A       Yes, I've got - -

ALJ         I'm sorry, trouble with what?

ATTY        One eye. I think he had - -

CLMT        I'm almost blind in my left eye.

BY ATTORNEY:

Q       Okay, now, you're not wearing glasses, do you have glasses?

A       I'm supposed to be wearing glasses but I have no way to get them right now. My medical card won't pay for the glasses itself.

Q       I see.

A       It only, it'll only pay for the exam.

                        *               *               *

Q       Okay. Any problem with allergies or sinus or headaches, anything like that?

A       Yes.

Q       Tell me about that.

A       Well my headaches are caused, most of my headaches are caused from not being able to get my glasses because without my glasses, my headaches come and go constantly.

                        *               *               *

A       My, I've got problems with my sinuses. They, and sometimes with my sinuses,

with the dust and stuff like that in the air, it seems to make my nose clog up and then once my nose gets stopped up, it's like I get, I start getting headaches with that too.

Q       How often do you have headaches?

A       Oh, I just got one, I just got rid of one the other day.

Q       Well, just an estimate.

A       That's anywhere probably two and three times a week - -

                    *                    *                    *

Q       Okay.  Now, as far as his overall condition, physical or mental, is his condition now approximately what it was when he was in school, is there any big difference there?

A       Well, all I can tell basically is, he's not having too many, as many periods of pain in his chest as he did when he was smaller - -

Q       Uh-huh.

A       - - cause he's learned that he can't do as much as he, you know, as he wants to do.

Q       Uh-huh.

A        But, you know, I don't know, it's like he knows he limits - -

Q       Uh-huh.

A       - - you know.

Q       Uh-huh.

A       And when he tries to do, I mean, if he gets up and tries to sweep the floor - -

Q       Uh-huh.

A       - - you know, help me around the house - -

Q       Uh-huh.

A        - - he pays for it.

Q        Uh-huh.

A        You know, the pain is there - -

Q        Uh-huh.

A        - - and it seems to get worse and worse each year.

Q        Uh-huh, all right.

*                *                *

BY ADMINISTRATIVE LAW JUDGE:

Q        Mr. Mahler, there's, I don't see any work of ample activity level.  Let me, well I got some questions.  The claimant, a person of the same age, education and work experience is limited to light work as that's defined in the Commissioner's Regulations, with no extreme heat or cold, the job cannot involve no reading, writing or math at more than the second-grade level, no detailed or complex instructions and no close concentration or attention to detail for extended periods, and the person should be able to move about a little bit so there'd  be ability to change positions briefly, and by briefly I mean just for a minute or two, at least every half hour.  There's the - - would there be any jobs such a person could do?

A        Yes, Your Honor, with those limitations at the light level of exertion, I could offer the following jobs, there would be hand packers, there are 600 in the local labor market, 200,000 in the nation, there are also laundry folders, 300 local, 48,000 in the nation, there are office cleaners, 1,100 local, 241,000 nation.

Q        Would there be any sedentary level jobs which would involve lifting no more than 10 pounds and sitting most of the day, but allow for a change of position?

A        Yes, Your Honor, there would be, with the limitations indicated, the sedentary level, there would be assemblers of small products, 650 local, 149,000 nation, there are also inspector/checkers, 150 local, 37,000 nation, and there are waxers of glass products, 160 local, 66,000 nation, these are all sedentary, Your Honor.

Q        Okay, is your testimony consistent with the DOT?

A        Yes, it is, Your Honor. The only inconsistency would be that it does not, the definitions in the DOT do not address the change of position. The reason I offered these jobs is based one experience in placing disabled workers for the past 25 years, I found that these classes of jobs usually do permit the change of position of the frequency indicated in your hypothetical.

Q        Okay. And how many days, if any, can a person miss work and still be able to do these jobs?

A        Usually one day a month is permissible in unskilled work, Your Honor.

ALJ        Go ahead, Ms. Van Nostrand.

ATTY        All right.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        And just to follow up a little bit on that last question, then I would imagine that an absenteeism rate of greater than one day per month would cause those jobs to be ruled out, that you identified?

ALJ        Well, that's what he just said.

ATTY        Okay.

ALJ        Yes, that's what he just said.

VE        That's correct.

ATTY          Okay.

                              *            *            *

BY ATTORNEY:

Q          I'd like to give some postural restrictions and ask you if these, if the cluster of

these postural restrictions would have any impact on any of the jobs that you identified.  This

person is limited to the rate of infrequent, which means a few times in an eight hour day, that

would probably correspond to rarely, okay, and so all of the postural motions of climbing,

balancing, stooping, bending, kneeling, crouching, crawling, stretching, reaching and squatting,

all of those are to be performed as a part of the job only infrequently, would that have any impact

on any of the jobs that you identified?

A          That would affect the light jobs, these all require occasional posturing.

Q          So that would restrict the person then, to a sedentary level?   That would - -

A          Yes, that, with that additional limitation of rare of infrequently posturing, yes, it

would.

Q          Okay.  Now, if you, in addition to the posturing that I asked you to assume,

assume that this person should avoid all exposure to machinery jarring or vibrations, but could

tolerate moderate exposure to humidity, cold or hot, fumes, dust, noise and environmental

hazards, would a moderate restriction from those additional environmental conditions have any

impact on these jobs that you identified?

A          No, it would not, in my opinion.

Q          All right.  Okay, now I'd like for you to assume some additional non-exertional

limitations that approximately, the limitations are approximately up to one half the time or

approximately up to 50% of the normal level of functioning, that this person would have difficulty responding appropriately to direction and criticism from supervisors.  He's been described as having a temper problem and he is somewhat oversensitive and so that would be true with regard to supervisors.  He would also be similarly limited in working in coordination with others, either without being distracted by them or distracting them, and he would have some difficulty relating predictably in social situations in the workplace, in other words, all of those are kind of tied together.  He would also be limited in carrying out an ordinary work routine without special supervision and in setting realistic goals and making plans independently of others.  He would also have, at approximately one-third to one-half the ability to tolerate the stress or ordinary work activity, you know, not necessarily high stress jobs, but just ordinary work activity.  Now I'm wondering if any of those additional assumptions would, in your opinion, have an impact on the jobs that you've identified?

      A        At the rate indicated in your hypothetical, up to 50% of the time, inability to relate to supervision, would affect the individual's ability to do these jobs.  There is occasional supervision in all the jobs.

      Q        Okay.

      A        If a person reacted - -

      Q        Right.

      A        - - poorly to occasional supervision 50% of the time - -

      Q        Okay.

      A        - - he would not be able to sustain these jobs.

      Q        And if - -

A        Also, he could not, if he could not, if he could not carry out the normal activities of these jobs without special supervision, he could not do any of these jobs.  These are all competitive work and they assume the ability to function independently without supervision, without additional supervision.

Q        All right, and just considering this one alone is demonstrating reliability and that, I think, is an overall restriction, meaning the ability to reliably carry out the job duties in an acceptable manner, and that is one-third to one-half the time.  Can you comment on that limitation by itself?

A        Yes.  If a person were not reliable in carrying out the job duties up to one-half of the workday, again, they would not be able to sustain these jobs, they are competitive and assume the ability to do so.

Q        All right.

*                *                *

E.        Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how claimant's alleged impairments affect his daily life:

•        Plays video games and listens to music.  (Tr. 1097, 1120).

•        Walks around outside.  (Tr. 1097, 1120).

•        Helps with household chores.  (Tr. 1098, 1120).

•        No problems getting dressed, bathing or eating.  (Tr. 1099, 1121).

•        Hunts squirrels.  (Tr. 1103).

- Helps with grocery shopping.  (Tr. 11120).

- Has friends occasionally visit.  (Tr. 1122).

- Has a girlfriend who visits him.  He occasionally stays at her house.  (Tr. 1123-24).

- Rides a bicycle.  (Tr. 1136).

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, claimant alleges that the ALJ erred in finding that claimant's back condition was not disabling and had not become worse since his prior decision; the ALJ impermissibly omitted claimant's "lazy eye" from his list of severe impairments; the ALJ did not give deference to the RFC opinion of claimant's treating physician, Dr. Dawlah; and there is a lack of support for the ALJ's RFC finding that the claimant would miss one day per month.

Commissioner maintains that substantial evidence supports the ALJ's determination that claimant's scoliosis was a severe, but non-disabling impairment; claimant's "lazy eye" is not a severe impairment; substantial evidence supports the ALJ's weighing of Dr. Dawlah's assessments; and substantial evidence supports the ALJ's determination that claimant's impairments would not result in more than one absence per month.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.      <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.      <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing

any work in the national economy.  Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.    Social Security - Substantial Evidence - Listed Impairment.  In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment.  Cook, 783 F.2d at 1168.  The ALJ must identify the standard to be applied.  Id. At 1173.  The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts.  Id

11.    Social Security - Listing.  The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met. Cook , 783 F.2d at 1168.  Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases."  Russell v. Chater, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[6]  In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing.  20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence.  Gordon, 725 F.2d 231.  See also Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980).

12.    Social Security - Claimant's Credibility.  "Because he had the opportunity to

---

[6] See FN 7.

observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference. See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

13.    Social Security - Treating Physician - Definition. A "treating source" is defined as a claimant's own "physician, psychologist, or other acceptable medical source" who provides a patient with medical treatment or evaluation and has an ongoing treatment relationship with the patient. 20 C.F.R. 404.1502. When the medical evidence establishes that the patient sees the physician with a frequency consistent with accepted medical practices for the type of treatment required, an ongoing treatment relationship is deemed to exist. See id. The term "other acceptable medical source" is defined as a licensed physician, a licensed osteopath, a licensed or certified psychologist , a licensed optometrist, and "persons authorized to send us a copy of summary of the medical records of a hospital, clinic, sanatorium, medical institution, or health care facility." 20 C.F.R. § 404.1513.

14.    Social Security - Treating Physician - Opinion that Claimant is Disabled. An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927. A statement by a medical source that Claimant is disabled or unable to work does not mean that the Commissioner will determine that Claimant is disabled. 20 C.F.R. §§

404.1527(e)(1), 416.927(e)(1). The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability. Id. No special significance will be given to the source of an opinion on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

15. Social Security - Treating Physician - Not Entitled to Controlling Weight. When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization. 20 C.F.R. §§ 404.1527(d), 416927(d). When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s). 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

16. Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton, 932 F.2d at 297 n.1.

17. Social Security - Treating Physician - No Controlling Weight - When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled, the determination or decision, "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be

sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

18.    <u>Social Security - Residual Functional Capacity</u>.  A Residual Functional Capacity is what Claimant can still do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  Residual Functional Capacity is an assessment based upon all of the relevant evidence.  <u>Id</u>.  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  <u>Id</u>.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  <u>Id</u>.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  <u>Id</u>.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  <u>Id</u>.

C.    <u>Discussion</u>

1.    <u>Whether the ALJ Erred by Finding Claimant's Back Condition Was Not Disabling and Had Not Become Worse Since His Prior Decision</u>

Two hearings were held in the present case.  Following the first hearing held on September 10, 2003, the ALJ, in a decision dated October 31, 2003, found that the Claimant was not disabled and therefore was entitled to neither Childhood Disability Benefits nor SSI payments.  Subsequent to this decision, another hearing was held on September 10, 2003.  On October 31, 2003 the ALJ again found that the Claimant was not disabled.  It is this decision that is currently before the Court.  Therefore, the relevant period at issue begins on November 1, 2003.  Claimant argues that the ALJ erred by ignoring the objective medical evidence that

Claimant's back condition had become worse since the October 31, 2003 decision. Specifically, Claimant argues that the ALJ "did not conduct an adequate analysis of the likelihood that the back condition was subject to change over time, or whether new evidence had been presented that a different finding with regard to scoliosis was suggested." (Cl's. Br. P. 11). Commissioner maintains that the ALJ found claimant's scoliosis to be a severe impairment at step two of the sequential analysis in 20 C.F.R. §§ 404.1520, 416.910. Commissioner argues that "this finding was an acknowledgment by the ALJ that [Claimant's] back impairment resulted in functional limitations that significantly limited [Claimant's] ability to perform basic work activities. 20 C.F.R. § 416.920(c)." (Comm's. Br. P. 10). Commissioner also argues that the ALJ fully accounted for functional limitations resulting from Claimant's scoliosis.

"SSA treats a claimant's second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability." Albright v. Comm'r, 174 F.3d 473, 476 (4th Cir. 1999). "To the extent that a second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of [claim] preclusion apply with full force." Id. The role of the District Court is to address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The District Court's role is to review "the decision of the ALJ as to whether the claimant was entitled to benefits during a specific period of time, which period was necessarily prior to the date of the ALJ's decision." Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999).

The ALJ made the following findings regarding Claimant's alleged back pain during the period at issue. The ALJ found that the Claimant made only intermittent complaints of back pain. (Tr. 36, 850). Claimant was taking no medication for back pain during the relevant period. (Tr. 36, 850-51). Dr. Sabio noted the Claimant had only mild scoliosis and that he had full range of motion. (Tr. 38, 851-52). Claimant's May 20, 2004 physical examination revealed no orthopedic problems. (Tr. 38, 852). Dr. Dawlah's May 10, 2005 physical examination revealed only mild scoliosis with occasional back pain. (Tr. 980). Dr. Dawlah suggested that Claimant could perform sedentary work. (Tr. 981). Dr. Dawlah's August 19, 2005 assessment was that Claimant was only incapable of doing "manual work involving lot (sic) of physical activity." (Tr. 39, 1003).

Claimant's reliance on Acquiescence Ruling 00-1(4) is not misplaced, as Commissioner would have this Court believe. Acquiescence Rulings explain how the SSA will apply decisions of the United States Courts of Appeals. AR 00-1(4) was issued to explain the effect of prior disability findings on adjudication of a subsequent disability claim. Specifically, AR 00-1(4) was meant to explain the 4th Circuit decision in Albright, 174 F.3d 473 (4th Cir. 1999)(Interpreting Lively v. Sec. of Health and Human Srvcs., 820 F.2d 1391 (4th Cir. 1987)). Claimant correctly states that an ALJ, when discussing the effect of a prior disability determination on a subsequent claim, must consider whether the fact on which the prior finding was based is subject to change with the passage of time; the likelihood of such a change considering the length of time that has elapsed between the period being adjudicated and the period being adjudicated in the subsequent claim; and the extent to which evidence not considered in the final decision on the prior claim provides a basis for making a different finding

with respect to the period being adjudicated.

The Court does not doubt that Claimant's back condition could have worsened between October 31, 2003, the date of the prior unfavorable hearing decision and September 26, 2005, the date of the decision at issue in the present case. It would have been clear error on the part of the ALJ had he simply incorporated the findings from his earlier decision into the current one with nothing more. However, the ALJ did not make this mistake. While the ALJ did not specifically cite the factors enumerated in AR 00-1(4), it is clear that he understood that two years was a significant passage of time and that Claimant's back condition was subject to change during that passage of time. Otherwise he would have merely glossed over the new evidence regarding Claimant's back condition, or worse, completely ignored it. The ALJ conducted a thorough analysis of most of the new evidence relating to claimant's back condition.

Claimant is correct that the ALJ overlooked certain medical records pertaining to Claimant's back condition. However, this was not an error on the part of the ALJ because this oversight did not prevent the ALJ from finding Claimant's scoliosis to be a severe impairment at step two of the sequential analysis. (Tr. 43, Finding No. 3). Claimant's argument is therefore without merit because not only did the ALJ not ignore Claimant's back condition, he actually found it to be a severe impairment

2. Whether the ALJ Impermissibly Omitted Claimant's "Lazy Eye" From His List of Severe Impairments

Claimant contends that the ALJ ignored one of Claimant's severe impairments, specifically his "lazy eye." Commissioner counters that the ALJ properly evaluated Claimant's impairments because Claimant, at the time of his application for benefits, failed to list a vision

problem among the illnesses, injuries or conditions that limit his ability to work. (Tr. 466).

The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton, 932 F.2d at 297 n.1; 20 C.F.R. §§ 404.1508, 416.908. An impairment or combination of impairments is not severe if it does not significantly limit a Claimant's physical or mental ability to do basic work activities. The ALJ determined that Claimant severe impairments include mild scoliosis; Tetralogy of Fallot (a congenital heart defect); depression; anxiety; borderline intellectual functioning; and history of attention deficit hyperactivity disorder.

Commissioner's argument that Claimant's failure to mention a vision impairment in any way until his hearing undermines his allegation of a severe vision impairment is not without merit. In Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994), the Court found it noteworthy that the claimant did not allege a disabling mental impairment in her application forms. The regulations impose upon the ALJ a duty to consider any impairments that the Claimant states he has. However, the regulations also require the ALJ to consider any impairments about which he receives evidence. The ALJ might have found Claimant's "lazy eye" to be nothing more than an "uncorrected vision" problem, and not a severe impairment, as Commissioner would have this Court believe. Nevertheless, this determination is to be made by the ALJ, not the Court. Dr. Lucky diagnosed Claimant with Amblyopia, Anisometropia and Hyperopia of the left eye. (Tr. 716-25). Claimant reported to psychologist Stafford that he was almost blind in the left eye. (Tr. 683). Claimant also testified at the hearing that he was almost blind in the left eye. (Tr. 1140). He further testified that he had headaches due to his eyes. (Tr. 1140-41). Therefore, the

57

Undersigned recommends the case be remanded with instructions to the ALJ to make a proper disability determination regarding Claimant's left eye problem.

       3.      <u>Whether the ALJ Erred by Failing to Give Deference to the RFC Opinion of Claimant's Treating Physician, Dr. Dawlah</u>

Claimant asserts that the ALJ improperly evaluated the opinion of Dr. Dawlah, Claimant's treating physician. Commissioner counters that substantial evidence supports the ALJ's weighing of the assessments of Dr. Dawlah.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. <u>Id</u>. The opinion of claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. <u>Evans</u>, 734 F.2d at 1015. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). <u>See</u> <u>Craig</u>, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). While the credibility of the opinions of the treating physician is entitled to great weight, it may be disregarded if there

is persuasive contradictory evidence. Evans, 734 F.2d at 1015. To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton, 932 F.2d at 297 n.1. Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

"If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Social Security Ruling (SSR) 96-5p at *3. The ALJ undertook such an analysis here. It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays, 907 F.2d. at 1456. The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's

judgment for that of the Commissioner.  Id.  The Court's review reveals that the ALJ reasonably resolved all such conflicts and that the record more than adequately bears out his conclusions.

Dr. Dawlah began seeing Claimant prior to the relevant period.  In January 2003, Dr. Dawlah opined that Claimant could perform sedentary work.  (Tr. 871).  On May 10, 2005, Dr. Dawlah again opined that Claimant may be able to do a sedentary job, but that he was also in need of a psychological evaluation.  (Tr. 981).  On August 15, 2005, Dr. Dawlah determined that Claimant was only incapable of doing "manual work involving a lot of physical activity."  (Tr. 1003).  On September 8, 2005, Dr. Dawlah again opined that Claimant was capable of performing sedentary work for an eight-hour workday if he could shift positions each hour, i.e., for sitting, standing, and walking.  (Tr. 1014-15).  However, within this same assessment, Dr. Dawlah stated that he did not believe that Claimant could perform a full-time job on a sustained basis.  (Tr. 1019).[7]

In this case, the ALJ considered Dr. Dawlah's assessments and noted that the assessments were generally consistent with a finding of non-disability.  (Tr. 38-39).  The following summary of the ALJ's decision refutes Claimant's argument that the ALJ failed to address Dr. Dawlah's assessments.  The ALJ addressed the May 20, 2004 DHHR [Department of Health and Human Resources] exam.  (Tr. 38).  The ALJ noted Dr. Dawlah's advising Claimant to quit smoking.  On that date, Dr. Dawlah noted Claimant to have normal/good posture and gait.  Furthermore, Dr. Dawlah adjudged Claimant's prognosis to be "good."  The ALJ found this evidence to indicate that Claimant's primary interest was in maintaining his eligibility for public

---

[7] It should be noted that opinions by medical doctors which are internally inconsistent or inconsistent with other evidence of record are entitled to little or no weight.  20 C.F.R. §§ 416.927(c)(2), (d)(4).

benefits. (Tr. 39). To further support his finding that Claimant's primary motivation was to maintain eligibility for public benefits, the ALJ noted a discrepancy in Claimant's subjectively stated basis for disability. In May 2004, Claimant stated to Dr. Dawlah that his basis for disability was "work restrictions by cardiologist/scoliosis/Tetralogy of Fallot repair and exertional dyspnea." (Tr. 39). In May 2005, Claimant again sought a statement from Dr. Dawlah for state welfare purposes. On this occasion, Claimant's only stated basis for disability was "difficulty with comprehension." (Tr. 39). Dr. Dawlah opined that Claimant should avoid "strenuous activity" and offered the opinion that Claimant could possibly perform a sedentary job. (Tr. 39). The ALJ concluded that Dr. Dawlah's assessments indicated that he believed Claimant to be "capable of performing work activity of low exertional demand."

Additionally, the ALJ's RFC included an accommodation for up to one unscheduled absence from work per month. (Tr. 41). Claimant argues this is error because Dr. Dawlah opined that Claimant would be expected to be absent from work for whole days, three or more times per month. (Tr. 1018). Opinions on ultimate issues, such as RFC are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). The ALJ's determination that Claimant would need no more than one unscheduled absence per month is supported by substantial evidence. Dr. Dawlah's opinion that Claimant would be expected to miss three to four days of work per month is not only inconsistent with Claimant's record as a whole, it is inconsistent with Dr. Dawlah's own findings. In May 2004 Dr. Dawlah found Claimant to have normal/good posture and gait. (Tr. 38, 863). In May 2005, Dr. Dawlah recorded Claimant's complaints of only "occasional" back pain; he opined that Claimant should avoid "only strenuous activity." (Tr. 39, 981). In August 2005 Dr. Dawlah opined that Claimant was only

incapable of "manual work involving a lot of physical activity." (Tr. 39, 1003). It was not until Dr. Dawlah's final assessment that he, for the first time and without any change in Claimant's condition, estimated Claimant would need to miss three or more days of work per month. It is on this point only that the ALJ's RFC assessment differs from Dr. Dawlah's.

Therefore, because Dr. Dawlah's opinion is inconsistent with other substantial evidence in the record, the ALJ did not err when he did not give controlling weight to the opinion of Dr. Dawlah.

4.      Whether Substantial Evidence Supports the ALJ's RFC Finding that Claimant Would Miss One Day Per Month

Claimant asserts that the ALJ erred in determining Claimant's Residual Functional Capacity (RFC). In so doing, Claimant is essentially rearguing his position from the previous argument - that the ALJ failed to support his finding that Claimant would need only one unscheduled absence per month. (Tr. 41). Commissioner counters that the ALJ properly determined Claimant's RFC.

A Residual Functional Capacity is what Claimant can still do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the

particular types of work a Clamant may be able to do despite their impairments.  Id.

With respect to Claimant's RFC, the ALJ determined that Claimant would need no more than one unscheduled absence from work per month.  The ALJ determined Claimant's RFC based on the medical opinions of Claimant's physicians, as was discussed above, and Claimant's daily activities.[8]  Although Claimant's school records show frequent absences from school, these records predate the relevant period at issue.  The Undersigned agrees with Commissioner that these records have no probative value because they were from a time when Claimant was, in fact, adjudicated disabled and prior to his medical improvement.  Moreover, Claimant testified that he plays video games and listens to music, takes walks, helps with household chores, occasionally goes hunting, helps with grocery shopping, has friends visit from time to time and has a girlfriend, at whose house he sometimes stays.  (Tr. 1097, 1098, 1099, 1103, 1120, 112-24).  It is the duty of the ALJ to make factual findings and resolve conflicts in the evidence.  Hayes, 907 F.2d at 1456.  This Court cannot say that, in light of the evidence of record and the evidence outlined in the ALJ's decision, there was not substantial evidence for the ALJ's determination of Claimant's RFC.  Therefore, the ALJ properly determined Claimant's RFC.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED**  because: 1) substantial

---

[8] "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively, 739 F.2d at 889 (citing Tyler, 409 F. Supp. 776).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference."  See  Nelson, 131 F.3d at 1237.  "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'"  Powers, 207 F.3d at 435 (citing Herr, 912 F.2d at181).

evidence supported the ALJ's determination that Claimant's scoliosis was a severe, but non-disabling impairment; 2) substantial evidence supports the ALJ's weighing of the assessments by Dr. Dawlah; and 3) substantial evidence supports the ALJ's determination that Claimant's impairments would not result in more than one absence per month. The Court recommends the case be **REMANDED** for further proceedings solely on the issues of whether Claimant's "lazy eye" constitutes a severe impairment that meets or equals one listed by the Secretary and if not, does Claimant's "lazy eye" effect the ALJ's finding that there are a significant number of jobs within the national economy that Claimant is capable of performing?

2.    Commissioner's Motion for Summary Judgment be **GRANTED** except on the two issues recommended to be remanded.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: November 4, 2008

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE