IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


WILLIAM S. NICHOLSON,

          Plaintiff,


v.                          CIVIL ACTION NO. 1:08CV17
                                 (Judge Keeley)


COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

          Defendant.


## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules
of Civil Procedure and Local Court Rule 4.01(d), on January 7,
2008, the Court referred this Social Security action to United
States Magistrate James E. Seibert with directions to submit
proposed findings of fact and a recommendation for disposition. On
November 4, 2008, Magistrate Judge Seibert filed his Report and
Recommendation ("R&R") recommending that the case be remanded for
further proceedings solely on the issue of whether Nicholson's lazy
eye constitutes a severe impairment that meets or equals one listed
by the Secretary and if not, does it effect the Administrative Law
Judge's finding that there are a significant number of jobs within
the national economy that Nicholson is capable of performing and
directed the parties, in accordance with 28 U.S.C. §636(b)(1) and

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the R&R.

On November 6, 2008, counsel for the defendant, Commissioner of Social Security, objected to the R&R. On November 8, 2008, Nicholson, by counsel, also objected to the R&R. On November 12, 2008, the Commissioner filed its response to Nicholson's objections.

## I.   PROCEDURAL BACKGROUND

On August 22, 1984, the Commissioner awarded Childhood Disability Benefits Supplemental Security Income ("SSI") to Nicholson. These benefits ceased on February 2, 1999 due to a disability cessation notice. Nicholson appealed the cessation notice and subsequently received an unfavorable reconsideration determination. On March 24, 2000, however, following a favorable hearing determination, the Commissioner restored the award of benefits.

On May 10, 2002, Nicholson received notice that the Commissioner was reviewing his SSI benefits under adult standards because he had reached the age of eighteen. On June 25, 2002, Nicholson submitted another application for Childhood Disability

Benefits. On September 30, 2002, the Commissioner determined that Nicholson's disability had ended on August 1, 2002 and terminated his SSI benefits as of September 30, 2002. In August 2002, the Commissioner also determined that Nicholson was "not disabled" with respect to his June 2002 application for Childhood Disability Benefits.

Following a September 10, 2003 hearing on these claims, on October 31, 2003, an ALJ issued an unfavorable decision. Nicholson requested a review of that unfavorable decision, which the Appeals Council denied on December 24, 2003.

On January 26, 2004, Nicholson filed a new protective filing for SSI and on January 31, 2004, he submitted another application for Childhood Disability Benefits alleging disability beginning at birth due to curvature of the spine, missing one-half vertebrae, heart disease/Tetralogy of Fallot and attention deficit hyperactivity disorder ("ADHD"). On April 27, 2004, the Commissioner denied these claims initially and, on August 17, 2004, denied them again after reconsideration.

After Nicholson requested a hearing, an ALJ conducted a hearing on September 9, 2005, at which Nicholson, represented by counsel, his mother and a vocational expert ("VE"), appeared and

3

testified. On September 26, 2005, the ALJ determined that Nicholson was not disabled at any time since November 1, 2003.

Relying on 20 C.F.R. §§ 404.987 *et seq.* and 416.987 *et seq.*, the ALJ determined that no new or material evidence or other basis sufficient to establish "good cause" existed for reopening and revising the October 31, 2003 hearing determination and, therefore, restricted the scope of consideration regarding Nicholson's disability status to the period after the date of the October 31, 2003 unfavorable decision. Thus, the period at issue here began on November 1, 2003.

On November 16, 2007, the Appeals Council denied Nicholson's October 25, 2005 request for a review of the September 26, 2005 decision, making it the final decision of the Commissioner. On January 1, 2008, Nicholson filed this action seeking review of that final decision.

## II. <u>PLAINTIFF'S BACKGROUND</u>

Nicholson was nineteen years old on November 1, 2003 and is considered a "younger individual 18-44" within the meaning of the regulations for the period at issue. Nicholson has an eleventh grade education and no vocationally relevant past work experience.

4

He reported trying to work as a stock person at a retail store but quit after four days due to weakness and shortness of breath.

### III.  ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found that Nicholson:

1.  Met the nondisability requirements for Childhood Disability Benefits set forth in Section 202(d) of the Social Security Act (with the exceptions noted in 20 CFR § 404.352(b)(2);

2.  Had not engaged in substantial gainful activity since November 1, 2003, the time period at issue;

3.  Had the following combination of severe impairments during the period at issue that, alone or in combination do not meet or equal a listed impairment and have not significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: mild scoliosis, Tetralogy of Fallot (a congenital heart defect), depression, anxiety, borderline intellectual functioning, and history of attention deficit hyperactivity disorder;

4.  Had no medically determinable impairments during the period at issue, alone or in combination, that presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d) and 416. 920(d));

5.  Was not fully credible regarding the period at issue concerning his impairment-related limitations and purported inability to work;

6.  Retained the residual functional capacity to perform at
    least a range of unskilled work that requires no more
    than a light level of physical exertion, accommodates
    brief, one to two minute changes in physical position at
    intervals not to exceed thirty minutes, entails no
    concentrated exposure to temperature extremes, involves
    only second grade or lower, if any, level reading,
    writing or mathematics, involves no detailed or complex
    instructions, requires no close concentration or
    attention to detail for extended periods, and
    accommodates unscheduled absences of at least one workday
    per month;

7.  Has no vocational relevant past work experience;

8.  Is considered a younger individual throughout the period
    at issue (20 CFR 404.1563 and 416.963);

9.  Has a "limited" (eleventh grade) education;

10. Had impairment-related limitations throughout the period
    at issue that precluded his ability to perform the full
    range of even light exertional work and, pursuant to
    Medical-Vocational Rule 202.17, is capable of performing
    a significant number of jobs that exist within the
    national economy, including hand packer, laundry folder
    and office cleaner, as well as sedentary positions as an
    inspector checker and glass products waxer; and

10. Was not under a "disability," as defined in the Social
    Security Act, since November 1, 2003, the period at issue
    (20 CFR 404.1520(g) and 416.920(g).

## IV.  OBJECTIONS

On November 6, 2008, counsel for the defendant, Commissioner

of Social Security, objected to any remand of the case for

consideration of Nicholson's alleged eye impairment. The

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Commissioner argues that remand is futile and unnecessary because Nicholson's application fails to list a vision impairment, and Nicholson's failure to "even mention a vision impairment until his hearing undermined his allegation of a severe vision impairment."

On November 8, 2008, Nicholson filed objections to the R&R, contending that the ALJ had failed

1)    to make the specific findings required in Acquiescence Ruling AR 00-1(4);

2)    to consider the reports from Dr. Dawlah pursuant to SSR 96-2p prior to determining that his back condition had not worsened;

3)    to consider Nicholson's record of school absences prior to determining that he would miss only one day per month from work; and

4)    Nicholson did not object to the remand of the case but argues that it "would be greatly prejudicial" if the Court remanded the case solely for review of the vision impairment.

On November 12, 2008, the Commissioner responded to Nicholson's objections, contending that Nicholson is asking this Court to re-weigh the evidence in this case and that, pursuant to

Craig v. Chater, 76 F.3d 585, 589 (4th Cir), a court may not "re-weigh conflicting evidence, make credibility determinations or substitute its judgment for that of the [ALJ]." The Commissioner asserts that the record contains substantial evidence to support the ALJ's findings.

## V.   RELEVANT MEDICAL EVIDENCE

The relevant medical history includes:

1.   A February 22, 2001 psychological evaluation from Lisa P. Stafford, M.S., C.S.P., indicating a WAIS-III: Verbal IQ 81, Performance IQ 85 and Full Scale IQ 81 WIAT scores of Basic Reading 68, Mathematics Reasoning 67, Spelling 55, Reading Comprehension 71, Numerical Operations 66, Written Expression 56, Reading Composite 61, Math Composite 63, and Writing Composite 49.

Stafford noted that Nicholson is a student of generally borderline cognitive ability, statistically is at the lowest end of the scale for his age, and needs to "exert some effort in completing assignments to the best of his ability;"

2.   August, 1997 through May 1, 2001 notes from Zubaer M. Dawlah, M.D., Gilmer Primary Care, indicating office visits during this period for complaints of back pain and a repeated diagnosis of scoliosis. The May 1, 2001 note indicated that Nicholson reported

that the back pain had increased in the last week. Dawlah noted that the pain did not radiate to the legs, that Nicholson had no particular problems with weakness in the legs, that there was slight scoliosis, some minimal para-lumbar muscle spasm on the right side, fairly good extension of the lumbar and the lower thoracic spine with forward flexion, negative straight leg test and no difficulty with ambulation. He started Nicholson on Neurontin and recommended a follow-up with his regular physician;

3.    An August 2, 2001 note from A.R. Fogle, PA-C, Gilmer Primary Care, indicating a complaint of "back hurting again" and an assessment of low back pain with history of Tetralogy of Fallot and with residual murmurs. Fogle prescribed Zanaflex, NSAIDS, restarted Neurontin, declined to prescribe Darvocet, and directed return in one month;

4.    A July 22, 2002 disability determination evaluation from Morgan D. Morgan, M.A., WV DDS, indicating a diagnostic impression of Axis I:(311) Depressive disorder NOS, Axis II:(V62.89) Borderline intellectual functioning, Axis III: Reported heart condition, curvature of the spine and seasonal allergies. Morgan noted that Nicholson appeared rather dysphoric and somewhat lethargic, that his "level of motivation during this assessment

appeared somewhat questionable" and that he "appeared rather uninterested in the evaluation process." After reviewing prior evaluations, Morgan noted that previous testing "displayed a high degree of variability over the years."

Morgan determined that Nicholson had the ability to maintain his personal hygiene, occasionally perform some household chores, care for his pets, hunt, play video games, listen to music, occasionally visit his uncle and girlfriend, had mildly deficient concentration, poor persistence, mildly slow pace, normal immediate memory, moderately deficient recent memory and a fair to guarded prognosis;

5.   A July 27, 2002 report from Arturo Sabio, M.D., WV DDS indicating a diagnostic impression of Tetralogy of Fallot, valvular insufficiency, and chronic back pain secondary to scoliosis. Examination revealed mild thoracolumbar scoliosis, tenderness over the spinous processes of the lumbar spine, normal range of motion in the spine and upper and lower extremities, normal equilibrium and coordination, normal fine manipulation movements and ability to control his bowels following a pull-through procedure to correct a imperforate anus;

6.   An August 1, 2002 Psychiatric Review Technique from Samuel Goots, Ph.D., indicating no limitations in restriction of activities of daily living or difficulties in maintaining social functioning, a mild degree of limitation in difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration;

7.   An August 2, 2002 Physical Residual Functional Capacity Assessment from Cynthia Osbourne, indicating a primary diagnosis of congenital heart disease and a secondary diagnosis of scoliosis. Osbourne determined that Nicholson can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, push and/or pull - unlimited, other than as shown for lift and/or carry, occasionally climb, balance, stoop, kneel, crouch, crawl, no visual limitations, and must avoid concentrated exposure to extreme cold and hazards such as machinery, heights, etc. Osbourne indicted "at present he is doing fairly well and RFC is reduced to light with height/hazard restrictions;"

8.　An October 4, 2002 Minnie Hamilton Health Care Center, Inc. note indicating complaints of back pain for three days and an assessment of muscle spasm in the left mid-back;

9.　A December 12, 2002 Gilmer County Urgent Care Note indicating Nicholson hurt his back in building construction and after one week was not getting better;

10.　A January 31, 2003 Routine Abstract Form – Physical from Gilmer Primary Care indicating abnormal vison (wears glasses), abnormal dyspnea with exertion, and abnormal heart sounds and a diagnosis of machinery murmur from Tetralogy of Fallot repair, exertional shortness of breath and scoliosis. The examiner indicted that, because of exertional shortness of breath, Nicholson would not be able to perform any job that required physical activity, suggested vocational rehabilitation for a possible sedentary job and noted that without patient motivation rehabilitation might not be successful;

11.　A February 20, 2003 Physical Residual Functional Capacity Assessment from Hugh M. Brown, M.D., indicating a primary diagnosis of surgically corrected Tetralogy of Fallot and a secondary diagnosis of acute cervical strain. Examination revealed Nicholson can occasionally lift and/or carry 20 pounds, frequently lift

and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, push and/or pull - unlimited, other than as shown for lift and/or carry, no postural limitations, no visual limitations, no environmental limitations and could do light work activity;

12.   June 18, 1984 through October 2, 2003 medical records from non-relevant period from Maternal & Child Health indicating continued diagnoses of Tetralogy of Fallot and Slight scoliosis;

13.   November 10, 1988 through May 14, 2003 notes from Lucky Eye Care, indicating a diagnosis of Amblyopia, Anisometropia and Hyperopia of the left eye. An October 11, 2001 note indicating Nicholson had lost his glasses six months before;

14.   A March 29, 2004 Mental Status Evaluation from Donna Morgan, DDS Examiner, indicating a diagnosis of Axis I: v71.09 No diagnosis, Axis II: v62.89 Borderline intellectual functioning, by history, Axis III: reported Tetralogy of Fallot, congenital malformations of the bowels and anus, and scoliosis. Examiner noted poor hygiene, disheveled grooming, open and cooperative manner, recently diagnosed scoliosis, no medications, unremarkable gait and posture, normal speech, fair insight, unremarkable psychomotor

13

behavior, a guarded prognosis, normal stream of thought, normal judgment, normal immediate memory, markedly deficient recent memory, normal remote memory, normal concentration, normal persistence and pace, normal social functioning and daily activities of playing video games;

15.  An April 8, 2004 x-ray report from Dean R. Ball, D.O., Mahoning Valley Imaging, Radiologic Consultation, indicating the frontal and lateral views of the thoracic spine reveal mild degenerative changes throughout, no fracture or destructive process, marked rotoscoliosis of the thoracic spine convexity to the left and well maintained intervertebral disc height.  A chest x-ray report from the same date indicating within normal limit cardiac and mediastinal contour and well aerated lung fields without acute infiltrate or consolidation;

16.  An April 10, 2004 report from Arturo Sabio, M.D., WV DDS, indicating examination revealed mild scoliosis at the thoracic level, normal neurological, normal range of motion, and normal fine manipulation and a diagnostic impression of Tetralogy of Fallot, status post repair of Tetralogy of Fallot, cardiomegaly, learning disability, attention deficit/hyperactivity disorder;

17.  An April 22, 2004 Psychiatric Review Technique and Mental RFC  from Michael E. Carter, Ph.D., indicating a mild degree of limitation in restriction of activities of daily living, mild degree of limitation in maintaining social functioning, mild degree of limitation in maintaining concentration, persistence or pace and no episodes of decompensation, each of extended duration, moderate limitation in ability to understand and remember detailed instructions, moderate limitation in the ability to carry out detailed instructions, limited ability to understand and remember complex or detailed instructions, ability to understand, remember and complete simple one and two step instructions, ability to complete a normal workweek without exacerbation of psychological symptoms, capable of asking simple questions and accepting instruction, able to maintain socially appropriate behavior and ability to perform repetitive work activities without constant supervision. Carter noted that Nicholson is "able to meet the basic mental demands of competitive work on a sustained basis despite the limitation resulting from his impairment;"

18.  An April 23, 2004 Physical RFC Assessment from Thomas A. Lauderman, DO, indicating Nicholson could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand

and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, push and/or pull, other than as limitation for lift and/or carry, occasionally climb, balance, stoop, kneel, crouch, crawl, and no visual or environmental limitations. Lauderman reduced Nicholson's RFC due to pain and fatigue;

19. A July 14, 2005 Chameleon Health Care psychological evaluation from Cynthia L. Hagan, MA & Michael D. Morrello, M.S., indicating complaints of inability to work due to decreased psychological functioning, increased physical pain, heart condition, fatigue, shortness of breath and dizziness, scoliosis, and incomplete discs in his shoulder blades. Nicholson's test results indicated WAIS-III: verbal IQ 84, performance IQ 85, full scale IQ 84, WRAT-III: reading 41, spelling 27, arithmetic 30. A diagnostic impression of Axis I: 296.33 Major Depressive Disorder, Moderate 300.00 Anxiety Disorder NOS, Axis II: V71.09 No diagnosis, Axis III: complications due to a heart condition, low back pain, Axis IV: economic Problem: low Income, Vocational Problem: Unemployed, and Axis V: 56.

Hagan noted

1) mild limitations in ability to understand, remember and carry out instructions, understand and remember short, simple instructions, carry out short, simple instructions, interact appropriately with the public, respond appropriately to direction and criticism from supervisors, maintain acceptable standards of courtesy and behavior, ask simple questions or request assistance from coworkers or supervisors,

2) moderate limitation in ability to understand and remember detailed instructions, carry out detailed instructions, exercise judgment or make simple work-related decisions, sustain attention and concentration for extended periods, maintain regular attendance and punctuality, complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of work breaks, work in co-ordination with others without being unduly distracted by them, relate predictably in social situations in the workplace without exhibiting behavioral extremes, demonstrate reliability, carry out ordinary work routine without special supervision, set realistic goals and make plans independently of others, tolerate ordinary work stress, respond to changes in the

work setting or work processes, be aware of normal hazards and take appropriate precautions,

3) no limitation in maintaining acceptable standards of grooming and hygiene, and

4) extreme limitation in ability to travel independently in unfamiliar places.

Hagan further noted that Nicholson had a mild degree of limitation in restriction of activities of daily living, a moderate degree of limitation in difficulties maintaining social functioning and maintaining concentration, persistence, or pace, and had experienced one or two episodes of decompensation, each of extended duration.

Hagan recommended a referral to a psychiatrist to assess the need for medication, counseling to address Nicholson's conditions of depression and anxiety and a referral to a pain clinic to learn new coping skills to deal with chronic pain;

20. A May 10, 2005 West Virginia Dept. of Health and Human Resources Disability Determination form completed by Dr. Dawlah indicating a diagnosis of mild scoliosis in thoracic spine and occasional back pain. Dawlah noted that Nicholson had "never

maintained full-time work", and that with vocational rehabilitation Nicholson might be able to "do sedentary job;"

21. A September 8, 2005 RFC Assessment from Dr. Dawlah indicating a medical history of low back pain, history of heart murmur from congenital heart disease, history of learning disability, depressive illness. Dawlah recommended sedentary (sitting most of the time, walking and standing occasionally, lifting no more than 10 pounds) as the level of activity for an 8 hour day. He noted that Nicholson must alternate positions frequently, requires a sit/stand option, can sit for one hour at a time, stand for one hour at a time and walk for one hour at a time, if alternately walking and standing, for 2 hours, sit upright for 1 hour per day, and is restricted from climbing, balancing, stooping, bending, kneeling, crouching, crawling, stretching, reaching, squatting, must avoid all exposure to machinery, jarring or vibrations and should avoid moderate exposure to excessive humidity, cold or hot temperatures, fumes, dust, noise, environmental hazards.

Dawlah further noted that Nicholson would experience chronic mild to moderate pain and intermittent severe pain, would be

expected to miss three or more days of work per month and was incapable of performing any full-time job; and

22.   An October 5, 2006 final report from Minnie Hamilton Health Care Center regarding an "AP View of the Dorsal and Lumbar Spine" with findings of

> Lumbar spine as seen on this examination is unremarkable. Severe deformity of the upper thoracic spine is noted. Hemivertebra is noted. Seer dextroscoliosis is noted with apex of the curvature at t3-4. Scoliosis measures 32.6 degrees.

Report notes an impression of severe dextroscoliosis of the thoracic spine with congenital anomaly, apex of the curvature at the level T3-4 and scoliosis measuring 32.6 degrees.

## VI.   DISCUSSION

### 1.   Failure to Comply with Acquiescence Ruling AR 00-1(4)

Nicholson contends that the ALJ ignored objective medical evidence that his back condition worsened after the October 31, 2003 decision, and failed to review and analyze all of the medical evidence of record prior to determining that his condition had not worsened following the October 31, 2003 determination. The Commissioner argues that the ALJ's decision complies with AR 00-1(4).

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Acquiescence Rulings are used to explain how the SSA will apply decisions of the United States Courts of Appeal. AR 00-1(4) addresses the effect of prior disability findings on the adjudication of a subsequent disability claim. It states:

> When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.
>
> Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does or does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

the period being adjudicated increases. An adjudicator shall give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks as in *Lively*. An adjudicator generally should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years as in *Albright*. In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

In Albright v. Commissioner of Social Sec. Admin., 174 F.3d 473 (4th Cir. 1999)(interpreting Lively v. Sec. of Health and Human Srvcs., 820 F.2d 1391 (4th Cir. 1987)), the Fourth Circuit determined that "SSA treats a claimant's second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability," and that "to the extent that a second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of [claim] preclusion apply with full force."

The ALJ's review of all of the medical evidence of record,

including the records from the previously adjudicated period, demonstrates that he understood and complied with the factors outlined in AR 00-1(4). The thorough analysis reflected in the ALJ's decision establishes he understood that two years was a significant passage of time, that Nicholson's back condition could have changed during that time, but that consideration and analysis of the evidence provided for his review fails to support a finding that Nicholson's back condition had worsened during that time.

The September 26, 2005 decision reflects that the ALJ specifically reviewed and analyzed the following evidence of record:

1) A hospital report dated September 15, 1997 indicating that Nicholson reported hurting his back in a fall from a swing several weeks earlier. The report further noted that Nicholson was "asymptomatic and on no medication," and that X-rays revealed no fracture;

2) A June 14, 1999 report following a physical examination indicating no complaints of or findings incidental to back pain;

3) A November 18, 1999 report following a physical examination indicating ability to keep up his activity with others in school, no medication and no chest pain or syncope;

4) A report from a May 8, 2000 visit to Dr. Ly, the first notation stating that Nicholson complained of "backache" over the preceding year, had gone to a clinic for "scoliosis" and had been taking medication (Flexeril) for three months;

5) Reports from August 2, September 18 and 20, and October 12, 2000 from A.R. Fogle, PA-C indicating no mention of back pain;

6) An October 19, 2000 report from A.R. Fogle, PA-C indicating Nicholson reported injuring his back two or three years ago, that it "had been hurting him at times," and that he was given a prescription for Flexeril;

7) Nicholson skipped his next scheduled appointment with Dr. Ly in November 2000;

8) A November 29, 2000 report from treating physician Zubaer M. Dawlah M.D. indicating complaints of continued back pain beginning "three weeks ago" with no report of any history of any trauma or lifting of weight;

9) A December 6, 2000 report from Dr. Dawlah indicating Nicholson was not taking his prescribed medication frequently, that his back pain was stable, and also noting that x-rays of the lumbar and thoracic spine taken on November 30, 2000 revealed

hemivertebrae on the right with resulted scoliosis at the fourth thoracic level and no abnormality with regard to the lumbar vertebrae;

10) A January 2001 report of constant back and chest pain because he had to run up and down stairs during class changes;

11) A February 27, 2001 report from Dr. Dawlah indicating Nicholson said his back was doing better since he had started to walk;

12) A May 1, 2001 report from Dr. Dawlah indicting complaints of "some back pain," with no radiation to the lower extremities and negative straight leg raise testing;

13) A July 9, 2001 report from a visit to a social worker indicating no reference to back pain;

14) An August 2, 2001 report from Dr. Dawlah's assistant indicating complaints of back pain;

15) A January 14, 2002 report indicating no complaint of back pain and noting he was "building a house" at school;

16) A May 23, 2002 report indicating no back pain;

17) A January 31, 2003 report from Dr. Dawlah noting he had filled out forms to be submitted to DHS indicating Nicholson could not perform any job that required any physical activity but could,

with proper motivation, possibly be trained for a sedentary position;

18) A September 23, 2003 report indicating Nicholson took "Naprosyn for backache once in a while" but was not taking any prescribed medication;

19) On October 2, 2003, Nicholson reported he had quit school and that he was not interested in a referral to vocational rehabilitation;

20) A May 20, 2004 report indicating that, after an absence of more than one year, Nicholson had returned to Dawlah for a Department of Health and Human Resources exam. Dawlah noted that Nicholson had normal/good posture and gait, that he told Nicholson to quit smoking, and that Nicholson reported his cardiologist (whose name he could not remember) in Charleston, West Virginia, had given him "work restrictions";

21) A May 2005, report indicating that Dawlah believed Nicholson may be able to do a sedentary job, but that he was also in need of a psychological evaluation;

22) An August 2005, report in which Dawlah determined that Nicholson was only incapable of doing "manual work involving a lot of physical activity;" and

23) A September 2005, report indicating Dawlah believed Nicholson was capable of performing sedentary work for an eight-hour workday if he could shift positions each hour, i.e., for sitting, standing, and walking. Significantly, within that assessment, Dawlah stated he did not believe Nicholson could perform a full-time job on a sustained basis.

After a careful and thorough review of all of the evidence of record, the ALJ determined as follows:

> It must be noted that all of the subjective complaints of both the claimant and his mother with regard to the claimant's impairment related symptoms and limitations have since February 1999 been offered within a context that has involved an underlying interest in maintaining or establishing the claimant's eligibility for disability-related financial benefits, which included both Supplemental Security Income, related medical insurance coverage and, apparently since at least January 2003, a form of state welfare assistance. The Administrative Law Judge believes that the record indicates that such subjective complaints have progressively escalated in conjunction with their efforts to establish or reestablish the claimant's entitlement and eligibility for such contingent and related benefits. It also appears to the undersigned that the claimant's allegations of debilitating impairment-related symptoms have been offered in an inconsistent manner and that the claimant has never identified any persistent body of symptoms that would impose total and ongoing

disability. The longitudinal record indicates
that his respective complaints as to shortness
of breath, back pain, neck pain and chest pain
have been offered on an intermittent and thus,
inconsistent basis.

In Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir.
1998), the Fourth Circuit determined that, in conducting the
"substantial evidence inquiry," a district court need only address
whether the ALJ analyzed all of the relevant evidence and
sufficiently explained his rationale in crediting certain evidence.
In Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999), the court
held that the district court's role is to review "the decision of
the ALJ as to whether the claimant was entitled to benefits during
a specific period of time, which period was necessarily prior to
the date of the ALJ's decision."

The Magistrate Judge noted that, if the ALJ had simply
incorporated the findings from his earlier decision into the
current one, with nothing more, he would have clearly erred. The
record, however, establishes that the ALJ did not do so.

The ALJ's thorough analysis, moreover, clearly demonstrates
that he noted the significant passage of time and then concluded
that the records related to that time period failed to provide any
support for Nicholson's subjective complaints regarding his back

pain and its effect on his functional limitations. Accordingly, based on Nicholson's intermittent and inconsistent statements regarding his back pain and the lack of objective medical evidence supporting his allegation that his condition had worsened, the ALJ determined that

> [n]o objective medical evidence of record has been developed since the unfavorable hearing determination of October 31, 2003, that warrant any departure from the fundamental disposition reached therein.

The Magistrate Judge concluded that, although the ALJ did not specifically enumerate the factors contained in AR 00-1(4), he addressed those factors in his decision, that his failure to specifically enumerate each factor was not error and that his decision regarding Nicholson's back condition was correct. The Court agrees.

**2.    Failure to Consider Evidence from Dr. Dawlah pursuant to SSR 96-2p**

Nicholson asserts that the ALJ failed to follow SSR 96-2p and therefore improperly evaluated the opinion of Dr. Dawlah, his treating physician. The Commissioner contends that the record contains substantial evidence to support the weight the ALJ assigned to the evidence from Dawlah.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

SSR 96-2p provides:

> Treating source medical opinions are still entitled to deference and must be weighed using all the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Pursuant to 20 C.F.R. §§ 404.1527(b), 416.927(b), an ALJ must consider all medical opinions when determining the disability status of a claimant. 20 C.F.R. § 404.1527 provides:

> (d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the

objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.</u> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we

would give it if it were from a non
treating source.

(ii) *Nature and extent of the
treatment relationship.* Generally,
the more knowledge a treating source
has about your impairment(s) the
more weight we will give to the
source's medical opinion.  We will
look at the treatment the source has
provided and at the kinds and extent
of examinations and testing the
source has performed or ordered from
specialists and independent
laboratories.

(3) *Supportability.*  The more a medical source
presents relevant evidence to support an
opinion particularly medical signs and
laboratory findings, the more weight we will
give that opinion. . . .

(4) *Consistency.*  Generally, the more
consistent an opinion is with the record as a
whole, the more weight we will give to that
opinion.

His September 26, 2005 decision reflects that the ALJ reviewed

the records from Dawlah, including that:

1)    In January 2003, Dawlah reported that Nicholson retained

the ability to do sedentary work;

2)    In May 20, 2004, Dawlah indicated that, after an absence

of more than one year, Nicholson had appeared for a Department of

Health and Human Resources exam. Dawlah noted that Nicholson had

normal/good posture and gait, that he told Nicholson to quit smoking, and that Nicholson reported his cardiologist (whose name he could not remember) in Charleston, West Virginia, had given him "work restrictions";

3)    In May 2005, Dawlah indicated that Nicholson may be able to do a sedentary job, but was also in need of a psychological evaluation;

4)    In August 2005, Dawlah determined that Nicholson was only incapable of doing "manual work involving a lot of physical activity"; and

5)    In September 2005, Dawlah indicated Nicholson was capable of performing sedentary work for an eight-hour workday if he could shift positions each hour, i.e., for sitting, standing, and walking. Significantly within the same assessment, Dawlah stated that he did not believe Nicholson could perform a full-time job on a sustained basis.[1]

Following his review, the ALJ noted a discrepancy in Nicholson's reported basis for disability. In May 2004, Nicholson

---

[1] It should be noted that opinions by medical doctors which are internally inconsistent or inconsistent with other evidence of record are entitled to little or no weight. 20 C.F.R. §§ 416.927(c)(2), (d)(4).

had told Dawlah that his basis for disability was "work restrictions from a cardiologist/scoliosis/Tetralogy of Fallot repair and exertional dyspnea." In May 2005, however, Nicholson's only stated basis for disability was "difficulty with comprehension."

In <u>Craig v. Chater</u>, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> [4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

42 U.S.C. §§ 423(d)(3) provides:

> (d)(3) For purposes of this subsection, a 'physical or mental impairment' is an impairment that results from anatomical,

> physiological, or psychological abnormalities
> which are demonstrable by medically acceptable
> clinical and laboratory diagnostic techniques.

In _Mastro v. Apfel_, 270 F.3d 171, 178 (4th Cir. 2001), the Fourth Circuit held that courts may assign "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. In _Hays v. Sullivan_, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated that the ALJ bears the ultimate responsibility for weighing the evidence and resolving any conflicts, and that, in reviewing for substantial evidence, the reviewing court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.

The Magistrate Judge noted that the only difference between the ALJ's RFC determination and Dawlah's opinion appeared in Dawlah's September 8, 2005 assessment, in which Dawlah indicated his opinion that Nicholson would need to miss three or more days of work per month. This opinion is inconsistent with the medical evidence contained in the record as well as all of Dawlah's

previous assessments, in which he stated that Nicholson retained at least the ability to perform sedentary work.

Moreover, pursuant to 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1), the Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability and, pursuant to 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3), no special significance will be given to the source of an opinion on issues reserved to the Commissioner.

The Magistrate Judge determined that the record contained substantial evidence to support the ALJ's RFC and the weight he assigned to Dawlah's opinions. The Court agrees.

**3    Effect of school absences on decision that Nicholson would miss work only one day a month.**

Nicholson asserts that the ALJ failed to consider the record of his school absences prior to determining that he would only require one unscheduled absence per month. The Commissioner, however, argues that the school records are not probative because 1) they predate the relevant period, 2) are from a period when Nicholson was adjudicated disabled, and 3) are prior to his medical improvement. The ALJ noted that Nicholson's school records reflect frequent absences from school. He further noted that these records

are for a period that not only predated the period at issue but also are from a period when Nicholson was adjudicated disabled. Moreover, Nicholson testified that some of his school absences were due to chest pains or flu or colds.

After a careful and thorough review of all of the evidence, the ALJ based his RFC decision on the medical evidence of record and Nicholson's reported daily activities that included playing video games, listening to music, taking walks, occasionally helping with household chores and shopping, visiting friends and occasionally staying at a girlfriend's home. He determined that Nicholson retained the ability to perform

> at least a range of unskilled work that requires no more than a light level of physical exertion, accommodates brief, one to two minute changes in physical position at intervals not to exceed thirty minutes, entails no concentrated exposure to temperature extremes, involves only second grade or lower, if any, level reading, writing or mathematics, involves no detailed or complex instructions, requires no close concentration or attention to detail for extended periods, and accommodates unscheduled absences of at least one workday per month.

Pursuant to 20 C.F.R. §§404.1527(e)(1)-(3), 416.927(e)(1), opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ.

The Court agrees with the Magistrate Judge's determination that Nicholson's school records have no probative value here.

**4    Remand for Consideration of Vision Impairment**

Nicholson next contends that the ALJ failed to consider his complaint of a "lazy eye". The Commissioner argues that the ALJ properly evaluated the impairments listed at the time of application for benefits and that the application included no mention of a vision problem.

The Commissioner directs the Court to 20 C.F.R. § 416.912(a)[2] which provides:

> (a) *General.* In general, you have to prove to us that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s). If material to the determination whether you are blind or disabled, medical and other evidence must be furnished about the effects of your impairments(s) on your ability to work, or if you are a child, on your functioning, on a sustained basis. We will consider only impairment(s) you say you have or about which we receive evidence.

The Commissioner also directs the Court to <u>Sullins v. Shalala</u>, 25 F.3d 601, 604 (8th Cir. 1994), which noted:

---

[2]    Cited in the objections as 20 C.F.R. § 415.912(a).

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

> We find it noteworthy that she did not allege
> a disabling mental impairment in her
> application for disability benefits, *see Smith*
> *v. Shalala*, 987 F.2d 1371, 1375 (8th Cir.
> 1993), <u>nor did she offer such an impairment as</u>
> <u>a basis for disability at the hearing</u>, *see*
> *Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th
> Cir. 1993).

(Emphasis added.)

42 U.S.C. § 423(d)(1), (3) requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. An impairment or combination of impairments is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. Here, the ALJ determined that Nicholson's severe impairments included mild scoliosis, Tetralogy of Fallot (a congenital heart defect), depression, anxiety, borderline intellectual functioning, and history of attention deficit hyperactivity disorder.

20 C.F.R. § 416.912(b)(3) provides:

> (b) *What we mean by 'evidence.'* Evidence is
> anything you or anyone else submits to us or
> that we obtain that relates to your claim.
> This includes but it not limited to:
>
>                     . . .

39

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

> (3) <u>Statements you or others make about your
> impairment(s), your restrictions, your daily
> activities, your efforts to work, or any other
> relevant statements you make to medical
> sources during the course of examination or
> treatment, or to us during interviews, on
> applications, in letters, and in testimony in
> our administrative proceedings</u>;

(Emphasis added.)

Thus, an ALJ must consider any impairments a claimant states he has as well as any impairments about which he receives evidence. Here, the record reflects that Dr. Lucky diagnosed Nicholson with Amblyopia, Anisometropia and Hyperopia of the left eye, that Nicholson reported to psychologist Stafford that he was almost blind in the left eye, that Nicholson testified at the hearing he was almost blind in eye and had headaches due to his eyes. The record also reflects that on February 20, 2003, Dr. Brown found no visual impairments.

Therefore, based on the fact that Nicholson reported his vision problems during a medical examination and also testified to vision problems at the administrative hearing and the ALJ failed to make a finding regarding the possible impact of a visual impairment on the issue of disability, the Magistrate Judge recommended that the case be remanded with instructions for a proper disability

determination regarding Nicholson's left eye problem.  The Court
agrees.

### VII. <u>CONCLUSION</u>

After reviewing the plaintiff's and the defendant's
objections, and following an independent <u>de</u> <u>novo</u> consideration of
all matters before it, the Court is of the opinion that Magistrate
Judge Seibert's Report and Recommendation accurately reflects the
law applicable to the facts and circumstances in this action.
Therefore, it

**ORDERS** that Magistrate Judge Seibert's Report and
Recommendation be and it is accepted in whole, and that this civil
action be disposed of in accordance with the recommendations of the
magistrate judge.

Accordingly, the Court

1.  **DENIES** the plaintiff's motion for Summary Judgment
    (Docket No. 15);

2.  **DENIES** the defendant's motion for Summary Judgment
    (Docket No. 17); and

3.  **REMANDS** the claim to the Commissioner for consideration
    pursuant to the recommendations contained in Magistrate
    Judge Seibert's Report and Recommendation and

41

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

specifically **DIRECTS** that further proceedings be limited solely to the issue of whether Nicholson's "lazy eye" constitutes a severe impairment that meets or equals one listed by the Secretary and, if not, whether Nicholson's "lazy eye" affects the ALJ's finding that there are a significant number of jobs within the national economy that he is capable of performing.

4.      This civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58.  If a petition for fees pursuant to the Equal Access to Justice Act (EAJA) is contemplated, the plaintiff is warned that, as announced in <u>Shalala v. Schaefer</u>, 113 S.Ct. 2625 (1993), the time for such a petition expires ninety days thereafter.

The Clerk of the Court is directed to transmit copies of this Order to counsel of record.

DATED: February 27, 2009.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE